599 A.2d 1248

FIRST PEOPLES BANK OF NEW JERSEY, PLAINTIFF–APPELLANT, v. TOWNSHIP OF MEDFORD AND STEPHEN D. SAMOST, DEFENDANTS–RESPONDENTS, AND JOSEPH SAMOST, DEFENDANT.

LAND AND MARKETING TECHNOLOGY, INC., A NEW JERSEY CORPORATION, PLAINTIFF–APPELLANT, v. TOWNSHIP OF MEDFORD AND MAIN LINE REALTY, A PARTNERSHIP, DEFENDANTS–RESPONDENTS, AND JOSEPH SAMOST, AN INDIVIDUAL; JOHN DOES 1–100; CEDARSTONE CONSERVATION COMPANY; ALL LAND REALTY CORP.; ESTATE OF IRWIN L. LEVY, MARLENE LEVY; TANGENT DEVELOPMENT, A PARTNERSHIP; FIRST PEOPLES BANK OF NEW JERSEY; SHARPS RUN ASSOCIATES, A LIMITED PARTNERSHIP; MEDFORD CIRCLE ASSOCIATES, INC.; AND WILLIAM V. BURK, AN INDIVIDUAL, DEFENDANTS.

HEDGE ASSOCIATES, A NEW JERSEY JOINT VENTURE, PLAINTIFF, v. TOWNSHIP OF MEDFORD, A MUNICIPAL CORPORATION; AND STEPHEN SAMOST, DEFENDANTS, MEDFORD WALK, INC., INTERVENOR.

Argued September 23, 1991—Decided December 30, 1991.

414

*Martin S. Ettin* and *Lewis Katz* argued the cause for appellants (*Katz, Ettin, Levine & Kurzweil,* attorneys).

*John A. Almeida* argued the cause for respondent Township of Medford (*John A. Almeida,* attorney; *Richard W. Hunt,* on the brief).

*Frederick W. Hardt* argued the cause for respondent Steven D. Samost.

*Jeffrey I. Baron* argued the cause for respondent Main Line Realty (*Thomas F. Crawford,* attorney).

The opinion of the Court was delivered by

POLLOCK, J.

First Peoples Bank of New Jersey (the Bank) challenges both facially and as applied the sewer ordinance of Medford Township (Medford or the Township). In unreported opinions, the Law Division and the Appellate Division sustained the ordinance. We granted the Bank's petition for certification, —— N.J. ——, —— A.2d —— (1991), and now affirm.

–I–

In the mid–1970s Medford experienced rapid land use development that overburdened the municipal sewer system. Consequently, the New Jersey Department of Environmental Protection (DEP) imposed a sewer connection ban. Medford's initial response was to adopt a "Flow Equalization Plan," which involved the use of holding tanks to store effluent during peak periods. By 1983, the sewer plant was again at its limit. DEP imposed a second sewer ban ordering the Township to increase the capacity of its pumping station. Land use development came to a halt. The Township's need to construct additional sewer capacity, combined with the problems of financing the

construction, led to the enactment of ordinances 1983–10 and –11.

Not challenged on this appeal is ordinance 1983–10, which appropriates $4.6 million to increase the capacity of the Township's sewage treatment plant from 1.3 to 1.75 million gallons per day. Instead, the Bank challenges ordinance 1983–11, which provides for the administration of the increased sewer capacity.

The intent of the ordinance, according to section 1, is "to establish the rules and regulations for connections to the Sewage Treatment Plant upon expansion, and to establish appropriate fees for the repayment of such notes and bonds as may be issued in order to finance and pay for the expansion to said plant." In that section, the governing body found that

> it is in the best interest of the Township to establish a priority list such that proposed users of the system desiring to connect to the system can pay for said connections and receive priority in and to the additional capacity to be generated by virtue of said expansion, subject, however, to the rights and interests of the Township to control the allocation of said capacity in the best interests of the Township and its residents in order that said reservation of capacity is not irrevocably committed to a proposed user who may not construct and/or build a project using part of the expanded capacity.

Thus, the ordinance contemplated the receipt of connection fees to pay for the additional capacity. It also contemplated that Medford would control the issuance of connection permits "in the best interests of the Township."

The central feature of the ordinance provides property owners with the option to purchase connection permits before obtaining municipal land use approvals. Accordingly, section 4H(1)(g) of the Sewer and Water Ordinance provides in pertinent part:

> Subject to the right of the Township to repurchase any sewer connection permit, as set forth in subsection (h) below, the owner of any lot, parcel or tract of land in the Township where construction or extension of public sewer is permitted by the Medford Development Ordinance, 1982–22, may purchase sewer connection permits for said lot, parcel or tract. The maximum number of permits which may be purchased shall not exceed the maximum number of residential dwelling units or non-residential units which could be constructed on the lot, parcel or tract under the applicable density, zoning, use, and performance standards and provisions of the said Development Ordinance.

The purpose of the provision allowing a developer to purchase sewer permits before obtaining final approval is to finance the cost of sewer plant improvements and to retire the debt incurred for those improvements. Consistent with this purpose, the cost of permit fees escalated annually until 1987. In effect, the ordinance granted a "discount" for the early purchase of permits.

The Township retains control over sold, but unused, permits in section 4H(1)(h), which provides:

> At such time as the committed capacity of the sewage treatment plant equals seventy-five per cent (75%) of the total permitted treatment or design capacity of the sewage treatment plant, and at any time thereafter, the Township may elect, at Township's sole option, to repurchase said permit. This repurchase shall be accomplished by giving written notice to the record owner of any said permit, stating the Township's intention to repurchase six (6) months from the date of said notice.

So essential to the project was the sale of permits that the Township attorney in December 1983 sent a letter to the owners of property who had received land use approvals or who would "require the use of public sewer when the property is developed." The letter warned that "unless there is financial cooperation from those landowners who will benefit from the additional capacity, the project cannot be completed." It continued:

> I am writing to advise you of the availability of the sewer connections and to urge you to purchase the required number of connections to serve your development or potential development. While the connections cannot be sold or transferred to another parcel, they are transferrable with your land if a developer, builder or thirty [sic] party purchases your property.
>
> By purchasing your connections prior to December 31, you will (a) save money (b) reserve capacity in the new expansion for your land and (c) help to insure that the project will be completed.

The Bank received the letter, but did not purchase any permits.

The plant's increased capacity of 450,000 gallons per day enabled Medford to make available 1,800 additional permits for sewer connections. Excluding the challenged sale to Samost,

Medford sold 901 permits, 730 of which were for projects that had not received land use approval at the time of the sale.

The Samost family and their associated entities (Samost) are the largest property owners in Medford, owning approximately 2,000 acres. On April 22, 1988, Samost purchased 825 permits at $4,000 per permit for a total cost of $3.3 million. Although the subsequent deletion of certain properties changed the terms of the purchase, Samost owned enough other land to support the purchase of all 825 permits. Approximately half of the lots represented by the 825 permits have received either preliminary or final development approval. The other half are the subject of applications for approval.

In total, the Township issued 1,770 of 1,800 permits, reserving 30 permits for emergency purposes. It then temporarily suspended the further issuance of sewer permits. Two days later the Bank unsuccessfully sought several sewer permit applications. Samost likewise sought additional applications. The Township denied both requests and, on May 3, 1988, imposed a sewer moratorium. The Bank thereupon challenged the validity of the ordinance and requested a court order directing Medford to accommodate the development of the Bank's property by expanding the capacity of the sewage plant or by repurchasing unused permits.

–II–

–A–

Generally, a reviewing court should presume the validity and reasonableness of a municipal ordinance. *Quick Chek Food Stores v. Township of Springfield,* 83 *N.J.* 438, 447, 416 *A.*2d 840 (1980). Anyone challenging an ordinance as arbitrary or unreasonable bears a heavy burden. *Dome Realty, Inc. v. City of Paterson,* 83 *N.J.* 212, 235, 416 *A.*2d 334 (1980); *Hudson Circle Servicenter v. Town of Kearny,* 70 *N.J.* 289, 298–99, 359 *A.*2d 862 (1976). Accordingly, a court will sustain an

ordinance if it is supported by a rational basis. *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543, 564–65, 350 *A.*2d 1 (1975). Five years ago, we acknowledged the cogency of the general rule of judicial deference when reviewing sewer ordinances. *Id.* at 152, 510 *A.*2d 1134; *see Sudler v. Environmental Disposal Corp.*, 219 *N.J.Super.* 52, 60–61, 529 *A.*2d 1022 (App.Div.1987) (deferring to decision of Board of Public Utility Commissioners allocating remaining sewer capacity to single developer). The municipal obligation is to provide a level playing field so that applicants are treated equally. *Meglino v. Township Comm. of Eagleswood*, 103 *N.J.* 144, 156, 510 *A.*2d 1134 (1986). Consequently, a sewer ordinance should withstand a challenge unless it is inequitable, unfair, or lacks adequate standards to insure the fair and reasonable exercise of municipal authority. *See* 5 McQuillin, *The Law of Municipal Corporations* § 18.12 at 453 (3d ed. 1989).

Expansion of a sewage treatment plant to serve future development is both costly and uncertain. In the early stages, the number of users may not suffice to bear the capital cost of construction. Borrowed capital may not be available without assurance of the success of the development to be served by the plant. See *Sudler, supra,* 219 *N.J.Super.* at 56, 529 *A.*2d 1022 (discussing problems in constructing and financing sewage treatment plants).

Confronted with a lack of sewage capacity and concerned about its ability to finance construction, the Township devised a system to raise the funds to finance the expansion of plant capacity. The Township's concern about raising revenue is reflected in the fee schedule, which provides that sewer permits purchased in 1983 would cost only $2,000, and that the fee would gradually escalate until 1987 and thereafter, when a permit would cost $4,000. Furthermore, the maximum number of permits a landowner could purchase is tied to the number of units that can be built on the owner's land. In sum, the plan is rationally related to a legitimate governmental purpose, the financing and allocation of sewage capacity.

Furthermore, the system allowed equal access to all developers. Any property owner, including the Bank, could have purchased the permits. All potential owners received the notice of sewer capacity expansion, and all knew of the limited supply of existing permits. In effect, the ordinance required developers to decide whether to purchase permits. The Bank decided not to make any such purchase. Others, like Samost, risked their capital by purchasing permits. Neither the ordinance nor its implementation disadvantaged any developer in deciding whether to purchase permits. The playing field was level.

–B–

In this Court, the dispute about the reasonableness of the ordinance centers on section 4H(1)(h), which governs the repurchase by the Township of unused permits. The Bank contends that the ordinance does not contain adequate standards to guide the municipality in determining whether to exercise its option to repurchase. *See Dome Realty, Inc., supra*, 83 *N.J.* at 238, 416 *A.*2d 334 (legislative standards insure that exercise of delegated authority will not contravene the underlying goals that prompted delegation); *Panama Refining Co. v. Ryan*, 293 *U.S.* 388, 440, 55 *S.Ct.* 241, 256, 79 *L.Ed.* 446, 469 (1935) (Cardozo, J., dissenting) (discretion may not be "unconfined and vagrant," but must be "canalized within banks that keep it from overflowing").

The Bank argues that by selling all remaining permits to Samost, the Township has effectively prevented the Bank from developing its land. The Township acknowledges that it may not use the absence of adequate sewer capacity as a means of preventing otherwise-permissible land use development. All parties agree that the Township must retain sufficient control to assure that sewer permits are either used or repurchased so that others may use them. Without an adequate repurchase provision, the ordinance could result in the improper delegation of access to the sewer system to private landowners who, by

purchasing permits, could prevent other owners from developing their land.

The inquiry thus becomes a search for adequate standards to guide the exercise of municipal discretion when considering the repurchase of permits. In conducting that search, we need not be confined to the specific terms of any one section of the ordinance, but may examine the entire ordinance, keeping in mind its objectives in light of the surrounding circumstances. *Schierstead v. City of Brigantine,* 20 *N.J.* 164, 169, 119 *A.*2d 5 (1955); *Ward v. Scott,* 11 *N.J.* 117, 123, 93 *A.*2d 385 (1952); 5 McQuillin, *supra,* § 18.12 at 455. A court may find adequate standards in language that is not minutely detailed, but general. *Dome Realty Inc., supra,* 83 *N.J.* at 238–39, 416 *A.*2d 334; *Schierstead, supra,* 20 *N.J.* at 170, 119 *A.*2d 5; *Ward, supra,* 11 *N.J.* at 123–24, 93 *A.*2d 385.

Thus, in *Dome Realty,* we considered "whether a municipality may require substantial compliance with the standards of habitability contained in its housing code before a new tenant may take possession of rented residential premises." 83 *N.J.* at 218–19, 416 *A.*2d 334. We determined that the phrase "substantial compliance with such Code" sufficed to guide municipal housing inspectors when considering applications of landlords for temporary certificates. We noted that the purpose of the ordinance, according to its "statement of policy," was "to protect the health, safety, and welfare of the citizens of Paterson." Accordingly, we concluded that the standard of "substantial compliance" was sufficiently clear to act as a restraint against arbitrary enforcement. *Id.* at 237–39, 416 *A.*2d 334.

Earlier, in *Ward v. Scott,* we found that the Legislature had provided adequate standards for the granting of variances by providing "the proper zoning purposes to be achieved including the lessening of congestion, the securing of safety from fire, panic and other dangers, the providing of adequate light and the prevention of overcrowding, the avoidance of undue concen-

tration of population, and the promotion of health, morals or general welfare." 11 *N.J.* at 125–26, 93 *A.*2d 385.

We likewise find that the challenged ordinance, although not exquisitely drafted, contains sufficient standards to withstand the Bank's challenge. Procedural guidelines in subsection (h), moreover, require the Township to give six months' written notice to a permit owner of the Township's intent to repurchase. When deciding whether to repurchase a permit, the Township has acted by resolutions adopted after discussions at public meetings.

Section 1 of the challenged ordinance provides that the allocation system is subject to

> the rights and interests of the Township to control the allocation of said capacity in the best interests of the Township and its residents in order that said reservation of capacity is not irrevocably committed to a proposed user who may not construct and/or build a project using part of the expanded capacity.

Additionally, the preamble of ordinance 1983–10, the companion ordinance to 1983–11, indicates the general policy goals governing the municipality's right of repurchase. The relevant provisions state:

> WHEREAS, the Township has recently purchased three separate water companies and has created a public water system and a public water and sewer utility for the purposes of providing public drinking water and effluent disposal for the health, safety and welfare of the residents of the Township; and
>
> WHEREAS, the Township Council desires to renovate the existing Sewage Treatment Plant which will increase the design capacity of the plant and enable the conversion to a tertiary treatment process in order to provide for the highest quality treatment possible for the protection of Township residents, downstream owners and adjoining municipalities; and

>    \*     \*     \*     \*     \*     \*     \*     \*

> WHEREAS, the Township Council remains concerned that there are sufficient customers of the water and sewer utility to equitably spread the cost of maintaining and operating the utility in order to keep annual usage rates as reasonable as possible; and
>
> WHEREAS, the utilization of public sewer will allow moderate growth within the designated growth areas, particularly commercial and light industrial development that will insure a sufficient mix and variety of tax ratables to promote a stable tax base in the municipality.

From those clauses we glean that Medford, when exercising its right of repurchase, must consider the public health, safety, and welfare, a reasonable and equitable allocation of costs, and the allowance of moderate growth.

Nothing indicates that the Township has acted arbitrarily in deciding whether to exercise its repurchase option. If the Township were to so act, a court might direct it to exercise its option to repurchase. *Cf. Barney's Furniture Warehouse v. Newark,* 62 *N.J.* 456, 470–71, 303 *A.*2d 76 (1973) (point could be reached when inattention to sewer plant would be arbitrary failure compelling judicial relief). At oral argument, the Township's attorney informed us that the Township had repurchased approximately fifteen permits and that it was considering the repurchase of others. We note that the record does not reflect that the Bank had made demand on Medford to repurchase specific permits. Hence, we view the Bank's attack on the repurchase provision as essentially facial.

Although the ordinance provides sufficient guidance to withstand such a challenge, it would better serve both the Township and property owners if it contained more specific standards defining the conditions under which permits would be subject to repurchase. Such standards could appropriately include the criteria the municipality will apply when exercising its rights to repurchase permits and a formula for more closely correlating the issuance of building permits and sewer permits. In the absence of such standards, the municipality runs the risk that in another case the ordinance might be found vulnerable as applied.

–III–

The final question is whether this Court should order the Township to expand the sewer plant to provide sufficient capacity for the Bank's development. The lower courts refused to issue such an order, characterizing the matter as a non-justiciable political question. We need not go so far as to say that

courts may never order an expansion of sewer capacity. It suffices to hold that the facts of this case do not justify such an intrusion in municipal affairs.

The Bank's argument for court-ordered sewer expansion rests on two opinions, *Reid Development Corp. v. Township of Parsippany–Troy Hills*, 10 *N.J.* 229, 89 *A.*2d 667 (1952), and *Deerfield Estates, Inc. v. Township of East Brunswick*, 60 *N.J.* 115, 286 *A.*2d 498 (1972). Those opinions, however, do not support the argument. In *Reid*, the developer requested a 600–foot water extension to develop his property in lots with less than 100–foot frontage. The township offered to comply with the request if the developer would subdivide the property into lots with 100–foot frontage. This Court, in holding that the township had abused its authority, stated that the obligation of the municipal water authority "includes the establishment of a distributive plant adequate to serve the needs of the municipality and the enlargement of the system to meet the reasonable demands of the growing community." 10 *N.J.* at 234, 89 *A.*2d 667. The Court ruled that "the extension of the water facilities was plaintiff's right; and it was an abuse of discretion to use the grant as a means of coercing the landowner into acceptance of the minimum-lot size restriction upon his lands, however serviceable to the common good." *Id.* at 238, 89 *A.*2d 667.

Two years later, the same developer requested the township to extend water service to other undeveloped land. The township unconditionally refused, and the Appellate Division sustained the refusal. The court distinguished the earlier case as involving "the municipality's withholding of the grant of the extension as a means of coercing the landowner into accepting a suggested change in the minimum lot size, which action was held to be an abuse of discretion." *Reid Dev. Corp. v. Township of Parsippany-Troy Hills*, 31 *N.J.Super.* 459, 464, 107 *A.*2d 20 (App.Div.1954).

In *Deerfield Estates, supra*, 60 *N.J.* at 125–26, 286 *A.*2d 498, this Court adopted that reading of our *Reid* opinion and stated

that "a municipality, engaged in furnishing water to its inhabitants, has a large measure of discretion as to the limits to which it should extend its mains." *Id.* at 130, 286 *A.*2d 498. As with decisions to extend water lines, municipalities enjoy broad discretion when deciding to expand sewer plants. 11 McQuillin, *supra,* § 31.17 at 229. The critical question for a reviewing court is whether the municipality has exercised its discretion in an arbitrary or discriminatory manner. *See Deerfield Estates, supra,* 60 *N.J.* at 130, 286 *A.*2d 498 (municipality obliged to serve impartially all similarly situated applicants); *Reid, supra,* 10 *N.J.* at 234, 89 *A.*2d 667 ("The utility is under a duty to serve all within the area who comply with fair and just rules and regulations applicable to all alike.").

Here, Medford has not been arbitrary or unreasonable in implementing the ordinance. All developers enjoyed equal access to the limited supply of sewer permits. The challenged ordinance is a reasonable, if homespun, attempt to meet the sewage treatment needs of a developing community.

This is not a case in which a municipality has rigidly refused to construct needed sewer capacity. The record does not support an inference that Medford's refusal "is the result of a determination not to discharge a plain duty...." 13 McQuillin, *supra,* § 37.27 at 101. Because of a municipality's greater familiarity with local conditions and expertise in constructing sewer capacity, a court should supplant the exercise of municipal discretion only in a compelling case. This is not such a case.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—none.