266 N.J. Super. 124 (1993)
628 A.2d 821
FERIOZZI COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND CONCETTA FERIOZZI, PLAINTIFFS,
v.
THE CITY OF ATLANTIC CITY, A MUNICIPAL CORPORATION AND BODY POLITIC OF THE STATE OF NEW JERSEY, AND CJM ASSOCIATES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division Atlantic County.
Decided April 2, 1993.
*126 Philip J. Perskie, for plaintiffs (Perskie & Nehmad, attorneys).
Paul J. Gallagher, for defendants.
WINKELSTEIN, J.S.C.
In this case the court is asked to decide the facial constitutionality of defendant City of Atlantic City's (the City) affirmative action plan (The Plan). It appears to be a case of first impression in this jurisdiction subsequent to the United States Supreme Court's landmark decision in Richmond v. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) which changed the legal landscape in evaluating the constitutionality of affirmative action ordinances. *127 This decision is a comprehensive explanation of the court's oral decision from the bench on April 2, 1993.

I. Background
The City established the Plan by Ordinance No. 14 of 1979, Executive Orders No. 2 of 1984, No. 1 of 1985, and No. 2 of 1992. The Plan required that bidders for public contracts achieve a minimum twenty five per cent (25%) minority participation through minority subcontractors and/or suppliers. Minority subcontractors owned or controlled by white-women could constitute no more than twenty per cent of the total minority participation. Plaintiffs, an unsuccessful bidder and property owner in the City, argue that the Plan is violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and discriminates against nonminorities under the New Jersey Constitution and 42 U.S.C.A. § 1983.
After the complaint was filed, the City, on March 17, 1993, adopted Ordinance 24 of 1993, (Ordinance 24), which amended the Plan. On March 31, 1993 the Mayor of the City signed Executive Order 2 of 1993, (the Executive Order) which rescinds Executive Order No. 2 of 1984, No. 1 of 1985 and No. 2 of 1992, and established standards of "good faith efforts" which are required to be made by all bidders and contractors.
As a result of the recent amendments to the Plan, the City argues that it is no longer violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as it does not create suspect classes based upon racial or ethnic criteria which would require a strict scrutiny test pursuant to Croson, supra. The plaintiff disagrees, arguing that section 7-15 of Ordinance 24, which requires a good faith effort to "utilize a minimum of ten percent minority contractors and/or suppliers" establishes a suspect class based on racial or ethnic criteria and thus the Plan remains constitutionally defective.

*128 II. The Facts
The facts are undisputed. The City is a municipal corporation of the State of New Jersey which operates under the Mayor-Council form of local government pursuant to the Faulkner Act, N.J.S.A. 40:69A-1 et seq. Plaintiff, The Feriozzi Company, Inc., (Feriozzi) is a corporation of the State of New Jersey engaged in the business of construction contracting which includes general contracting, concrete work and excavation. Plaintiff Concetta Feriozzi is an individual who owns real property in the City, and is a principal of Feriozzi.
On March 31, 1992, Feriozzi submitted a bid to the City for a project which involved the realignment of Albany Avenue and Captain O'Donnell Parkway in the City. In accordance with standard City procedure, the bid was sent to its affirmative action office for review. The affirmative action officer denied the application for consideration as a Women Business Enterprise (WBE) which would have qualified under the Plan as a minority business. Feriozzi's bid was therefore rejected and the contract awarded to another bidder.[1]

III. The Plan
The pertinent provisions of the City's Plan (as codified as Chapter 7 of the Atlantic City Code) were as follows:
ORDINANCE No. 14 of 1979
AN ORDINANCE to regulate persons, firms, associations, companies, partnerships and corporations, wishing to develop or engage in the assistance in the development of projects within the City of Atlantic City.
WHEREAS, it is in the public interest to regulate and approve economic development projects in the City of Atlantic City; and
WHEREAS, such developers do not necessarily have sanctioned affirmative action plans or committments [sic]; and

*129 WHEREAS, it is in the public interest to ensure minority entrepreneurs and equal opportunity for economic development;
NOW, THEREFORE, The Board of Commissioners of the City of Atlantic City do ordain:
SECTION 1. That all firms, corporations, partnerships, or any combination thereof wishing to do business with or in the City of Atlantic City shall present to the Atlantic City Planning Board upon application for development opportunity an equal employment opportunity affidavit and must agree to make a bona fide effort to utilize minority contractors and suppliers paying prevailing wages.
....
SECTION 4. That all firms, ... wishing to do business with or in the City of Atlantic City, utilizing government funding, ... shall make a good faith effort to utilize a minimum of ten percent (10%) minority contractors and/or suppliers.
....
Atlantic City, N.J., Ordinance 14 (March 1, 1979).
EXECUTIVE ORDER NO. 2 OF 1984
....
WHEREAS, the provisions of Ordinance No. 14 of 1979 have been inadequately enforced, with the result that millions of dollars in development and business activity have transpired in the City of Atlantic City with little involvement by minority owned businesses, and it is now necessary to redress the failure of the City of Atlantic City to live up to its obligations in the past; and
WHEREAS, in order to improve the City's efforts herein, it is necessary:
(a) to mandate that the percentages required by Ordinance No. 14 of 1979 be increased for a period of ten (10) years; and
....
ARTICLE I. DEFINITIONS

....
(a) Minority Business Enterprise  A minority business enterprise is an independent business concern which is at least 51% owned and controlled by minority group members; ...
(b) Minority Group Members  Minority group members are citizens who are Black, Hispanic, Asian or American Indian, as further defined by the Executive Committee.

*130 ....
ARTICLE III. MINIMUM MINORITY PERCENTAGES

On December 1, 1984, Section 1 of Ordinance No. 14 of 1979 relating to the bona fide effort of all firms, ... wishing to do business with or in the City of Atlantic City to utilize minority contractors and suppliers shall be interpreted to require a minimum of 25% utilization of said minority contractors and suppliers.
Further, the minimum percentages of minority contractors and/or suppliers provided for in Section 4 of the aforesaid Ordinance relating to all firms, ... doing business with or in the City of Atlantic City utilizing government funding, ... shall be increased from 10% to 25%. These increased percentages shall be in effect for a period of ten (10) years or until modified by subsequent Executive Order.
Atlantic City, N.J., Executive Order 2 (1984) at 3-5
EXECUTIVE ORDER NO. 1 of 1985
....
WHEREAS, at this time it is necessary to amend Executive Order No. 2 of 1984 to expand the definition of "minority" to include women:
....
(b) Minority or Minority Group Member  means a person who is:
1. Black, which is a person having origins in any of the black racial groups in Africa; or
2. Hispanic, which is a person of Spanish or Portuguese culture with origins in Mexico, South or Central America or the Caribbean Islands, regardless of race; or
3. Asian-American, which is a person having origins in any of the original peoples of the Far East, South-East Asia, Indian subcontinent, Hawaii, or the Pacific Islands; or
4. American Indian or Alaskan Native, which is a person having origins in any of the original peoples of North America; or
5. Women  which means a female or females regardless of race.
Atlantic City, N.J., Executive Order 1 at 1-2, (1985).
EXECUTIVE ORDER NO. 2 of 1992
....
WHEREAS, at this time it is necessary to amend Executive Order No. 2 of 1984 to amend the minimum minority percentages; Section I of Ordinance No. 14 of 1979 relating to the bona fide effort of all firms, ... wishing to do business with or in the City of Atlantic City to utilize minority contractors and suppliers shall be interpreted to require a minimum of 25% utilization of said minority contractors *131 and suppliers. Said minimum 25% utilization shall include a minimum of 20% utilization of MBE contractors and or suppliers and a 5% minimum utilization of WBE contractors and or suppliers. Further, the minimum percentage of minority contractors and or suppliers provided for in Section 4 of the aforesaid ordinance ... shall require a minimum 25% utilization to include a minimum of 20% utilization of MBEs and a 5% utilization of WBEs. These increased percentages shall be in effect for a period of 10 years or until modified by subsequent Executive Order or Ordinance.
Atlantic City, N.J., Executive Order 2 at 1-2 (1992).
When read in its entirety, the Plan, prior to its amendment, infra., denied a specific percentage of nonminority citizens the opportunity to compete for public contracts based solely on their race or ethnic background. The Plan established quotas based upon race and ethnic criteria in an attempt to remedy past discrimination. However, neither the ordinance nor the executive orders which constituted the Plan were based upon any empirical data showing that discrimination existed in the construction industry in general, or that any bidders or potential bidders for City contracts in particular, discriminated in hiring minorities or in using minority suppliers. In other words, there was no objective evidence to support a finding of prior racial or ethnic discrimination in the process of awarding City contracts which would have justified the use of racial quotas.

IV. The Amended Plan
Ordinance 24 made substantial changes to the Plan. First, the preambles to Ordinance 24 do not make reference to past discrimination. Under its policy statement, Section 7-1, it was provided that the goal of the City was "to provide equal employment and business opportunity for all persons, ... and to prohibit discrimination in employment and business practices because of race, color, religion, sex, ancestry or national origin and to promote the full realization of equal employment and business opportunity through a positive and continuing program." It's purpose was to provide all businesses in the City "equal opportunity to participate in the contract process." Ordinance 24 deleted the definitions as to minority business enterprises and minority group members. It *132 further deleted all references to setting aside certain percentages of contracts for minority contractors or suppliers.
Section 7-15 does continue to provide, however, that there should be good faith efforts to utilize minority contractors and/or suppliers. It reads as follows:
All firms, corporations, partnerships or any combination thereof wishing to do business with or in the City of Atlantic City utilizing government funding, tax abatement or any other means of government or public funds or guaranty shall make a good faith effort to utilize a minimum of ten percent (10%) minority contractors and/or suppliers.
Executive Order 2 of 1993 defines "good faith efforts" as:
(A) A requirement that contractors provide copies of written notification to Minority Business Enterprises (MBE's) and Women-owned Business Enterprises (WBE's) that their interest in a subcontract is solicited;
(B) A requirement that evidence of the efforts made to divide the work into economically feasible segments in order to increase the likelihood of achieving the stated voluntary goal;
(C) A requirement of evidence of efforts made to negotiate with MBE's and WBE's, including, at a minimum:
(1) Names, addresses and telephone numbers of the MBE's and WBE's who were contacted; and
(2) A description of the information provided to MBE's and WBE's regarding the plans and specifications or portions of the work to be performed; and
(3) A statement of the reasons why additional agreements with MBE's and WBE's, if needed to meet the stated goals, were not reached;
(D) A requirement of evidence of efforts made to assist MBE's and WBE's contacted who need assistance of obtaining bonding and insurance which the bidder or offerer requires;
(E) A requirement, as to each MBE and WBE contacted which the contractor considered not to be qualified, a written statement of the reasons for such conclusion;
(F) Submission of written quotes solicited from all MBE's or WBE's seeking subcontract work with prime contractor at the time of bidding; and
(G) Evidence of other good faith efforts to utilize MBE's and WBE's in private and public contracts, apart from the contract presently being discussed, within the past twelve months.
The language of section 7-15 which previously provided remedies for noncompliance with the ten percent minority participation requirements was deleted. The deleted sections included provisions which allowed the City to enforce the ten percent minority requirements through the courts, penalized the contractor when *133 evaluating future bids, and provided for monetary penalties for failure to comply. It is the City's position that by eliminating the remedies for noncompliance, ten percent minority participation is merely a goal to encourage nondiscrimination in future contracts and does not establish racial or ethnic quotas.

V. The Law and Analysis
A reviewing court should presume the validity and reasonableness of a municipal ordinance. First Peoples Bank of New Jersey v. Township of Medford, et al., 126 N.J. 413, 599 A.2d 1248 (1991) (citing Quick Chek Food Stores v. Township of Springfield, 83 N.J. 438, 447, 416 A.2d 840 (1980)). Where the general welfare is served, an ordinance is presumed to be valid. Inganamort v. Borough of Fort Lee, 120 N.J. Super. 286, 293 A.2d 720 (Law Div. 1972). The party challenging an ordinance as arbitrary or unreasonable bears a heavy burden. The obligation of the municipality is to provide a level playing field so that applicants are treated equally. First Peoples, supra, 126 N.J. at 418, 419, 599 A.2d 1248 (citing Dome Realty Inc. v. City of Paterson, 83 N.J. 212, 235, 416 A.2d 334 (1980) and Meglino v. Township Committee of Eagleswood, 103 N.J. 144, 156, 510 A.2d 1134 (1986)).
The thrust of plaintiffs' argument is that the Plan discriminates by denying plaintiffs equal protection under the Fourteenth Amendment. The Equal Protection Clause provides, in pertinent part, "... no state shall deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend XIV, § 5. Preferential treatment may be afforded certain citizens under certain situations based upon racial or ethnic criteria, but such treatment is subject to strict scrutiny. Wygant v. Jackson Bd. of Education, 476 U.S. 267, 273-274, 106 S.Ct. 1842, 1846-1847, 90 L.Ed.2d 260, 268 (1986).
If a ... suspect class is involved, the legislative classification is subject to strict scrutiny, Barone v. Department of Human Services, 107 N.J. 355, 364-65 [526 A.2d 1055]; Greenberg v. Kimmelman, 99 N.J. 552, 564 [494 A.2d 294] (1985), which requires that a statute further a compelling state interest and that there be no less restrictive means of accomplishing that objective.

*134 Brown v. City of Newark, 113 N.J. 565, 573, 552 A.2d 125 (1989) (citation omitted).
The strict scrutiny test therefore requires a two-fold analysis. First, any racial classification must be justified by a compelling governmental interest and, second, the means chosen by the government entity to carry out its purpose must be narrowly tailored to the achievement of that purpose. Wygant, supra, 476 U.S. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 268 (citations omitted).
This test was applied in Croson, supra, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In Croson the Richmond City Council adopted as part of an ordinance a minority business utilization "set-aside" plan, which required nonminority owned prime contractors awarded city construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more minority business enterprises from anywhere in the United States, with each such enterprise being at least 51% owned and controlled by citizens who were Blacks, Hispanic, Orientals, Indians, Eskimos, or Aleuts. The passage of the ordinance was based, in part, on a study which indicated that while the city's general population was 50% black, only 0.67% of the city's prime construction contracts had been awarded to minority businesses over a five year period. The study also found that a variety of contractors' associations had virtually no minority businesses within their membership.
Another basis for passage of the ordinance was that there was a "feeling" that the general conduct of the construction industry in the area around Richmond, and in the state and nation in general, was one in which race discrimination and exclusion on the basis of race were widespread. No direct evidence of race discrimination on the part of the city when letting contracts, or any evidence that the city's prime contractors had discriminated against minority owned subcontractors, was presented to the Richmond City Council prior to passage of the ordinance.
*135 The Croson Court struck down the ordinance as violative of the Equal Protection Clause of the Fourteenth Amendment, concluding that "when a legislative body chooses to employ a suspect classification, it cannot rest its decision upon a generalized assertion as to the classification's relevance to its goals." Croson, supra, 488 U.S. at 500, 109 S.Ct. at 725, 102 L.Ed.2d at 886. In rendering its decision the Court emphasized that the Fourteenth Amendment is not dependent on the race of those burdened or benefited by a particular classification. Croson, supra, 488 U.S. at 494, 109 S.Ct. at 722, 102 L.Ed.2d at 882 (citation omitted). In other words, "the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." Id. (citing University of California Regents v. Bakke, 438 U.S. 265, 289-290, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978)). The Court concluded that while there was no doubt that the history of both private and public discrimination had contributed to a lack of opportunities for black entrepreneurs, such an observation alone could not justify a rigid racial quota in awarding public contracts; that an amorphous claim that there had been past discrimination in a particular industry "cannot justify the use of an unyielding racial quota." Croson, supra, 488 U.S. at 499, 109 S.Ct. at 724, 102 L.Ed.2d at 885.
In order to use race as a means to remedy past discrimination, judicial, legislative or administrative findings of constitutional or statutory violations must first be made. Croson, supra, 488 U.S. at 497, 109 S.Ct. at 723, 102 L.Ed.2d at 884 (citing Bakke, supra, 438 U.S. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d 750.) The Croson Court emphasized that the Richmond Plan's effect was to apportion public contracts on the basis of race. Croson, supra, 488 U.S. at 505, 109 S.Ct. at 727, 102 L.Ed.2d at 889.
Croson clearly creates a heavy burden upon a local government before race or ethnic based classifications can be established. There must be administrative findings of constitutional violations before a suspect class can be created to remedy past discrimination. *136 As the plaintiff properly points out, neither the Citys' governing body, prior to the passage of Ordinance 14 of 1979 or Ordinance 24 of 1992, nor the Mayor, prior to passage of the subject executive orders, made such findings. No empirical data was provided as a basis for findings of past discrimination.
Such findings are not, however, required as a matter of course whenever a local government seeks to implement an affirmative action program. An ordinance is not per se unconstitutional merely because it encourages contractors to use a specific percentage of minority participation. The constitutionality of an ordinance, where a fixed percentage of minority participation is suggestive, but not mandatory, is dependent upon how the ordinance is administratively applied. Contractors Ass'n of E. Pa. v. Philadelphia, 945 F.2d 1260, 1268 (3d Cir.1991) (Higginbotham, Jr. Concurring).
In the Philadelphia case, the affirmative action plan was ultimately found to be unconstitutional. See Contractors Ass'n. v. City of Philadelphia, 1992 W.L. 245851 (E.D.Pa. 1992), and Contractors Ass'n v. City of Philadelphia, 735 F. Supp. 1274 (E.D.Pa. 1990). The Philadelphia ordinance, however, contained provisions substantially different from those in the subject Plan. For example, the Philadelphia ordinance required that specific percentages of minority participation be established in terms of the total dollar amount of city contracts awarded during each fiscal year. It also established what was described as a "sheltered market" which set aside a certain percentage of contracts for minority business enterprises. Philadelphia Code, Chapter 17-400, et seq. (1982), (later amended and renumbered 17-500 et seq.). The City's Amended Plan does not contain the same or similar provisions.
Generally, a policy that permits but does not require unconstitutional conduct is not facially unconstitutional. Contractors Ass'n, supra, 945 F.2d at 1268 (citing Cone Corp. v. Florida Dept. of Trans., 921 F.2d 1190, 1209 (11th Cir.) cert. denied ___ U.S. ___, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991)). "A court cannot assume that a suspect classification has been created", San *137 Antonio Independent School District v. Rodriguez, 411 U.S. 1, 19, 93 S.Ct. 1278, 1289, 36 L.Ed.2d 16 (1973), as such a determination must be made in light of how the ordinance is actually implemented. Contractors Ass'n supra, 945 F.2d at 1269.
With the passage of Ordinance 24 the City has deleted penalties for noncompliance with the ten percent minority participation provision. It has been represented to the court that the 10% figure in § 7-15 is a goal, not a quota; that Ordinance 24 was passed in an effort to eliminate future discrimination, not to remediate past discrimination. In other words, failure to meet the ten percent goal will not result in any sanctions against the contractors as would have occurred had a quota not been met under the Plan prior to its amendment. As such, no suspect classification has been created based on race or ethnicity.
The City has declared the provision of equal employment and business opportunity for all persons as public policy. This is a laudable goal. The New Jersey Legislature has already established a public policy against discrimination in this State. In enacting the Law Against Discrimination, N.J.S.A. 10:5-1, et seq. the State Legislature clearly found discrimination to be abhorrent to public policy and a threat to the public welfare.
The Legislature finds and declares that practices of discrimination against any of its inhabitants ... are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State ...
....
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma. Illness, homelessness or other irreparable harm resulting from the strain of employment controversies ...

N.J.S.A. 10:5-3.
These concerns apply equally to the citizens of this State on a local level. It is clearly in the public interest for a local government *138 to take appropriate steps to eradicate discrimination in the award and administration of public contracts.
A state enactment which is challenged under the Equal Protection Clause[2] that does not implicate suspect classifications or fundamental rights merits only "rational relationship" scrutiny, and a court will strike it down only if the means chosen are wholly irrelevant to the state's objectives. Schwartz v. Judicial Retirement System of New Jersey, 584 F. Supp. 711 (D.C.N.J. 1984) (citation omitted). All legislative distinctions are not per se invalid; only discriminatory or totally arbitrary distinctions violate the equal protection clause. Id.; See also U.S.A. Chamber of Commerce v. State, 89 N.J. 131, 158, 445 A.2d 353 (1982) (citation omitted), where the Court held that under the rational basis standard of review a court must first inquire whether there is a conceivable legitimate state objective and second whether the classification selected is rationally related to that objective.
The federal district court's decision in Associated Pennsylvania Constructors v. Jannetta, 738 F. Supp. 891, 893 (M.D.Pa. 1990), is instructive.
The policies [of suggesting percentages of minority participation] do not require (emphasis supplied) use of certain percentages of women and minorities but, rather, seek to ensure no current discrimination. (emphasis in original.) The policies are screening devices as opposed to a classification....

Id. at 893.
Applying a similar analysis in the instant case I am satisfied that the Plan, as amended, is not facially unconstitutional. It does not require that certain percentages of contracts be set aside for minorities. It does not attempt to remediate past discrimination by setting up suspect classifications, and thus no empirical data establishing that prior discrimination existed is necessary. It does not establish rigid racial quotas which were the offending provisions *139 of the Richmond Affirmative Action Plan. What the Plan does is encourage nondiscrimination in the future. As such, the Croson strict scrutiny test does not apply. Seeking ten percent minority participation, but not requiring it, furthers legitimate public policy considerations. The Plan is a valid exercise of the municipality's obligation to provide a level playing field so that all applicants are treated equally. Meglino, supra, 103 N.J. at 156, 510 A.2d 1134. It does not afford preferential treatment to certain citizens based upon race or ethnic criteria.
The Plan as amended does not require unconstitutional conduct. It does not impose a burden upon the plaintiff or other potential bidders because of race. Neither does it grant a benefit to a party because of race or ethnic background. What it seeks to do is to have all parties treated equally.
As previously stated, this decision concerns the facial constitutionality of the Plan. If in the future the suggested ten percent minority participation provision is administratively applied as a quota, rather than as a policy goal, a different result may be reached. That issue is not, however, now before the court.

VI. Conclusion
Based on the above, the Plan as amended is declared constitutional on its face and the allegations in the complaint which seek to declare it unconstitutional and a violation of 42 U.S.C.A. 1983 are dismissed.
NOTES
[1] Subsequent to filing the complaint Feriozzi and the City agreed that Feriozzi would not pursue the bid. The matter is proceeding as a taxpayer suit. See Skakel v. North Bergen, 37 N.J. 369, 377, 181 A.2d 473 (1962).
[2] The state standard for equal protection is the same standard that is used under the federal constitution. Levine v. Institutions & Agencies Dep. of N.J., 84 N.J. 234, 257, 418 A.2d 229 (1980).