659 A.2d 941

IN THE MATTER OF THE REPEAL OF N.J.A.C. 19:53 AND THE ADOPTION OF A NEW RULE CONCERNING EQUAL EMPLOYMENT AND BUSINESS OPPORTUNITY BY THE CASINO CONTROL COMMISSION.

---

H.A.I.L., D.I.A.L., INC. AND THE MENTAL HEALTH ASSOCIATION IN NEW JERSEY, ALL NONPROFIT CORPORATIONS OF THE STATE OF NEW JERSEY, AND DAVID ESPOSITO, APPELLANTS, v. CASINO CONTROL COMMISSION AND STEVEN P. PERSKIE, JAMES R. HURLEY, FRANK J. DODD, JEANNINE LARUE, AND LEANNA BROWN, ALL IN THEIR OFFICIAL CAPACITY AS MEMBERS OF THE CASINO CONTROL COMMISSION, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 9, 1995—Decided June 5, 1995.

218

Before Judges LANDAU, CONLEY and NEWMAN.

*Susan E. Di Maria* argued the cause for appellants (*David P. Lazarus,* Community Health Law Project, attorneys; *Ms. Di Maria* and *Robert F. Williams* on the brief).

*Linda D. Headley,* Senior Managing Attorney, argued the cause for appellant New Jersey Protection and Advocacy Incorporated (*Sarah W. Mitchell,* Executive Director, of counsel; *Ms. Headley,* on the brief).

*David C. Missimer,* Assistant General Counsel, argued the cause for respondent New Jersey Casino Control Commission (*Mr. Missimer* of counsel and on the brief).

*Regina H. Nugent,* Deputy Attorney General, argued the cause on behalf of *amicus curiae* State of New Jersey (*Andrea M. Silkowitz* and *Joseph L. Yannotti,* Assistant Attorneys General, of counsel; *Jeffrey C. Burstein,* Deputy Attorney General, and *Ms. Nugent* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

These consolidated appeals have been brought by three advocacy groups for the handicapped, the Handicapped Advocates for Independent Living (H.A.I.L.), the Disability Information Awareness and Living (D.I.A.L.), and the Mental Health Association in New Jersey, Inc., and David Esposito, a handicapped individual. The appeals involve a challenge to the current regulations promulgated by the Casino Control Commission in *N.J.A.C.* 19:53 pursuant to *N.J.S.A.* 5:12–134 and –135. The regulations implement fairly substantial equal employment and affirmative action requirements for women and racial/ethnic minorities but only minimal requirements for the handicapped. As they apply to the handicapped, the new regulations represent a significant reduction of such requirements as had been required under the prior regulations. Although appellants originally included in this appeal a challenge to the absence of any quotas or hiring goals for the handicapped, appellants advised us during oral argument that, at the present time, they do not seek the imposition of such goals. As all acknowledge, while the establishment of goals and hiring quotas is discretionary pursuant to *N.J.S.A.* 5:12–135, information that is not presently available may render the exercise of that discretion appropriate.

Given appellants' present position, however, we do not address that issue here and address the alleged deficiencies in the current regulations within the context of all but the specific requirements for goals established for women and racial/ethnic minorities. Appellants here challenge on statutory and constitutional grounds the under-inclusiveness of the current regulations as they apply, or more to the point, do not apply to the handicapped.

■ We conclude that within the context of the Commission's exercise of its interpretative and regulatory authority over *N.J.S.A.* 5:12–134 and –135, the removal of the handicapped from the scope of the Commission's previous rather inclusive equal employment opportunity and affirmative action requirements was arbitrary, unreasonable and without sufficient basis. We remand

to the Commission for promulgation of new regulations for the handicapped and direct the Commission, either through its Advisory Board or itself, to take whatever steps it deems necessary to obtain and compile whatever necessary statistical data it needs to determine what is required for the promulgation of such regulations. We caution, however, that it is not within the province of the Commission to determine that there is presently no underemployment in the casino industry of the handicapped obviating the need for anything other than the passive equal employment opportunity requirements that the current regulations impose for the handicapped. That determination has already been made by the Legislature.

*N.J.S.A.* 5:12–134 provides that all casino industry applicants and licensees:

> ... shall formulate for commission approval and abide by *an affirmative-action program of equal opportunity* whereby the applicant guarantees *to provide equal employment opportunity* to ... members of minority groups qualified for licensure in all employment categories, *including the handicapped*, in accordance with the provisions of the "Law Against Discrimination" P.L.1945, c. 169 (C.10:5–1 et seq), except in the case of the mentally handicapped, if it can be clearly shown that such handicap would prevent such person from performing a particular job.
>
> [*N.J.S.A.* 5:12–134(c), emphasis added].

Similarly, *N.J.S.A.* 5:12–134(b) provides that the Commission shall not issue any license to a casino or a casino service industry "who has not agreed to afford *an equal employment opportunity* to all prospective employees *in accordance with an affirmative-action program* ". *N.J.S.A.* 5:12–135 expressly empowers the Commission to, among other powers, "investigate and determine the percentage of population of minority [1] groups in the State or in areas thereof from which the work force for the licensee is or may be drawn" and to "establish and promulgate such percentages as guidelines in determining the adequacy of

---

[1] As used in *N.J.S.A.* 5:12–135(a) the term "minority groups" clearly includes the handicapped. *See N.J.S.A.* 5:12–134(c) referring to the handicapped as included with minority groups to which the act applies.

affirmative action programs submitted for approval pursuant to [5:12–134]."

It is through *N.J.A.C.* 19:53 that the Commission has implemented the requirements of, and exercised the discretion delegated by, *N.J.S.A.* 5:12–134 and –135. Regulations were initially promulgated in 1978. While they established hiring goals only for women and racial/ethnic minorities [2], the regulations otherwise included the handicapped in what can be considered fairly progressive equal employment affirmative action requirements. Pursuant to repealed 19:53–1.3 and 1.4, for instance, licensees were required to insure that casino contractors and subcontractors had affirmative action programs covering handicapped persons as well as women and racial/ethnic minorities. Section 1.5 set out affirmative action requirements for applicants and licensees including the requirement that handicapped persons be "recruited and employed at all levels of the workforce," and that a licensee employing more than fifteen employees send "notices of employment openings, opportunities, training programs or pre-employment tests" to organizations serving the interests of the handicapped. *N.J.A.C.* 19:53–1.5(a)(5), repealed. Section 1.6 required that gaming schools submit reports showing the composition of the student body in terms of protected groups, including handicapped persons; and send notices concerning their enrollment policies to

---

[2] The exclusion of the handicapped from the hiring goals established under the prior regulations was challenged by appellants H.A.I.L. and D.I.A.L. in a class action seeking to compel such goals for the handicapped. Their complaint in lieu of prerogative writs was dismissed by the trial judge. We affirmed that dismissal in an unpublished opinion. *Handicapped Advocates for Independent Living v. Casino Control Comm.*, No. A–1720–89T2. In doing so, we agreed with the Commission's position that numerical goals pursuant to *N.J.S.A.* 5:12–134, –135 are not mandated, but rather within the discretionary power of the Commission and we noted that such power may be exercised with respect to women and racial/ethnic minorities and not the handicapped, subject of course to review on the basis of an abuse of discretion. We concluded that appellants' complaint, however, was premature, since administrative remedies had not been exercised. It does not appear that those remedies were pursued.

organizations serving the interests of the groups protected under the Act.

Consistent with these provisions, the repealed rules had included a statement describing the long-term "public policy" of the State "to promote equal employment opportunity by prohibiting discrimination and by implementing affirmative action programs ... to achieve a balanced workforce." *N.J.A.C.* 19:53–1.1(a), repealed. In accord with this "policy", Section 1.1(b) described the regulations as establishing "affirmative action program requirements" and "procedures for achieving compliance with these affirmative action program requirements."

During the public hearings on the new regulations, statistical data was presented indicating that the handicapped were "seriously under-represented in the [casino industry] workforce." [3] Key to this data is a calculation of the number of disabled employees in the casino industry. The only figure available is the Commission's. While the Commission conceded that number is not accurate and admitted that it had not enforced the prior reporting requirements concerning the number of handicapped persons in the workforce, resulting in "meaningless" reports, its response has been to eliminate the reporting requirement entirely under the new regulations, albeit retaining such requirements for women and racial/ethnic minorities.

Indeed, the Commission has done a complete turnabout in its view of *N.J.S.A.* 5:12–134 and –135 as applicable to the handicapped. Under the new regulations, the "public policy" of the State is described as intended to "promote equal employment by

---

[3] According to Dennis Rizzo, a staff member of the New Jersey Developmental Disabilities Council, there is a total of 42,376 people employed in the casino industry. Using the Commission's number of 165 handicapped employees, Mr. Rizzo computed that only .04% of the casino workforce consisted of the handicapped, whereas 10% of the New Jersey population were disabled. In contrast, women and racial/ethnic minorities, 51% and 22% of the New Jersey population respectively, have employment rates in the casino industry of 45% and 42% respectively. The Council recommended a figure of 5% as a reasonable goal for employment of the handicapped in the casino industry.

prohibiting discrimination and by encouraging businesses to achieve a balanced representation of employees". *N.J.A.C.* 19:53–1.1(a). The new policy definition does not allude to affirmative action. Affirmative action is mentioned in new section *N.J.A.C.* 19:53–1.1(b), but is limited to women and minorities (defined in new section 1.2 as including only racial and ethnic minorities).

Consistent with the new "policy" interpretation, the revised rules eliminate entirely for the handicapped any requirement that all licensees and their contractors have approved affirmative action plans which guarantee that the groups listed in *N.J.S.A.* 5:12–134 shall be recruited and employed at all levels of the workforce. Also eliminated for the handicapped are the requirements for outreach in seeking to recruit the handicapped such as those in repealed *N.J.A.C.* 19:53–1.6.

To be sure, the general requirements of the new regulations prohibiting discrimination by licensees and contractors apply to all of the protected classes set out in *N.J.S.A.* 5:12–134. Further, regulations require the chief executive officer of each licensee and applicant to insure "that a policy advocating the employment and advancement of persons with disabilities is promulgated and enforced". *N.J.A.C.* 19:53–1.4(a). Nevertheless, it is plain that the new rules provide far less benefit to the handicapped than do the repealed rules. The generalized requirement to report on any "efforts" to employ and advance persons with disabilities sharply contrasts with the detailed substantive and reporting requirements for affirmative action programs for women and racial/ethnic minorities and there is no counterpart directive to *N.J.A.C.* 19:53–4.3 which requires "affirmative measures to insure that women and minorities [4] are recruited and employed at all levels." Aside from the establishment of numerical goals, there are other extensive affirmative measures designed to encourage recruitment and employment of women and racial/ethnic minori-

---

[4] *N.J.A.C.* 19:53–1.2 defines "minorities" as an African American, Hispanic, or an Asian American.

ties that are not extended to the handicapped. See *N.J.A.C.* 19:53–2.4(a)3, –2.5(c) 6 and 8, –2.6; *N.J.A.C.* 19:53–3.3(a), –3.3(b) 2 and 4; *N.J.A.C.* 19:53–3.4(c); *N.J.A.C.* 19:53–4.3(a), –4.3(b); *N.J.A.C.* 19:53–4.5(b); *N.J.A.C.* 19:53–4.6(c). Statistical data on the composition of the work force is required, but only as to gender and race. *N.J.A.C.* 19:53–2.10(a); *N.J.A.C.* 19:53–3.4(c); *N.J.A.C.* 19:53–4.6(c).

In lieu of any but the most minimal of affirmative measures, and in response to the substantial criticism generated by what appears to be a wholesale reduction of protections formerly determined to be responsive to the statutory provisions [5], the Commission created the Advisory Board on the Disabled, consisting of "members of the regional disability community" and representatives of advocacy organizations for the disabled and the casino industry. *N.J.A.C.* 19:53–1.5(b). The Advisory Board is to "identify, investigate, and make recommendations to the Commission concerning issues which affect the ability of disabled persons to obtain employment and business opportunities with the casino industry", and to develop a program to identify and report disabled employees and business owners, and suggest "the promulgation of specific regulations." *N.J.A.C.* 19:53–1.5(b). To our knowledge, however, the only action the board has taken is to reject as impractical a presentation by Professor Monroe Berkowitz, Director of the Disability and Health Economics Section of the Rutgers Bureau of Economic Research, recommending a "simple" form to survey employers in order to obtain accurate data concerning the handicapped in the work force.[6]

---

[5] This criticism came not only from various groups and organizations representing the disabled, but from other State agencies, including the Division of Gaming Enforcement.

[6] During the public hearings on the new regulations, Professor Berkowitz testified that, based upon a statewide survey conducted in 1991 in conjunction with the New Jersey Developmental Disabilities Council, 4.5% of the population between the ages of eighteen and sixty-nine "are disabled persons who are in the labor force ... either working or ... actively looking for work" and he estimated

In explaining its apparent backpedaling on the handicapped, and in rejecting the negative responses thereto, the Commission said in part:

> The Commission disagrees with the legal analyses of the commenters. Section 134 of the Casino Control Act requires each applicant for a casino or casino service industry license to "formulate ... and abide by an affirmative-action program of equal opportunity **whereby the applicant guarantees to provide equal employment opportunity** to rehabilitated offenders ... and members of minority groups qualified for licensure in all employment categories, including the handicapped ..." *N.J.S.A.* 5:12-134c (emphasis supplied). This language is consistent with that contained in subsection 134b which provides that "[n]o license shall be issued ... to any applicant ... **who has not agreed to afford an equal employment opportunity** to all prospective employees in accordance with an affirmative-action program approved by the commission and consonant with the provisions of the "Law Against discrimination [citation omitted]." *N.J.S.A.* 5:12-134b.(emphasis supplied).
>
> The Commission does not know why the Legislature, in describing the statutory equal employment opportunity obligations to be imposed on applicants and licensees, chose to use the term "affirmative-action program." But the language highlighted above clearly indicates that the fundamental statutory obligation imposed on applicants and licensees relates solely to the provision of **equal employment opportunity**. Equal employment opportunity and affirmative action are totally separate legal concepts. The Casino Control Act and the Law Against Discrimination mandate that casino and casino service industry licensees and applicants provide equal employment opportunity to the disabled, ethnic minorities, and women, but not affirmative action.
>
> [25 *N.J.R.* 3845].

As expressed in this statement, the Commission views the Legislature as requiring equal employment opportunity measures under *N.J.S.A.* 5:12-134 but not affirmative action. Plainly, such an interpretation is not correct. What is required is an affirmative action program of equal employment opportunity. The equal employment opportunity program, then, required under *N.J.S.A.* 5:12-134(c) must incorporate measures of affirmative action. While we ordinarily defer to an agency's interpretation of a

---

another two percent should be added to account for people who have dropped out of the labor force "because they have become discouraged and feel that no jobs are available for them." It was in the context of this testimony that Professor Berkowitz recommended the use of "a simple one-page confidential form" developed by the Rutgers Bureau of Economic Research to survey the employers. Presumably his presentation to the Advisory Board was along the same lines. Why such a form would be impractical has not been explained.

statute that it is charged with enforcing, no such deference is required where such interpretation "flout[s] the statutory language and undermine[s] the intent of the Legislature." *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 A.2d 468 (1993).

The more fundamental question is what those affirmative measures must be. For instance, are they limited to measures designed to increase participation in the pool of qualified applicants for employment or do they extend more aggressively to measures designed to promote hiring? One could argue that "affirmative action" is modified and limited by "equal employment opportunity" and thus only measures designed to increase the pool of qualified applicants are required. We note, however, the Legislature's awareness that "equal employment opportunity" and "affirmative action" are not necessarily consonant. *See N.J.S.A.* 10:5–34 (as the Law Against Discrimination applies to public works contracts, "equal employment opportunity but not affirmative action is required with respect to persons identified solely by their affectional or sexual orientation.").

By its prior regulations, the Commission interpreted the requirement of *N.J.S.A.* 5:12–134 as requiring measures that go beyond simply "equal employment opportunity" and beyond what has been provided for the handicapped under the current regulations. Moreover, its present interpretative analysis of *N.J.S.A.* 5:12–134 in support of a restrictive application to the handicapped simply cannot be justified in light of the far more progressive application to women and racial/ethnic minorities, putting aside the separate establishment of specific goals pursuant to *N.J.S.A.* 5:12–135.

Aside from its skewed reading of the statute, the Commission attempts to justify the virtual elimination of the handicapped from the affirmative measures previously provided and now provided only for women and racial/ethnic minorities on the basis of a lack of valid information as to whether there is any need for such measures. Certainly what statistics are available indicate there is

such a need. Although it is conceded the statistics are not reliable, the Commission abdicates its responsibilities by responding to the difficulty in obtaining accurate information by simply repealing the affirmative measures and establishing a Board that seems to be doing nothing.

■ The record reflects an overwhelming abundance of individual organizations and groups available to assist the Commission in compiling whatever necessary information the Commission feels it needs. It is its responsibility to affirmatively obtain that information. We thought this was going to occur in 1989 when we affirmed the dismissal of appellants' prior litigation.

We recognize that at least one individual expressed a view during the public hearing on the new regulations that he knew of no actual employment problems that any handicapped had incurred. But that is not the point. By virtue of the express inclusion of the handicapped within the protections of *N.J.S.A.* 5:12–134, the Legislature has made a determination that such problems do exist and require remediation in the form of affirmation action programs for equal employment opportunities. As we have said, the Commission has previously broadly interpreted that protection, an interpretation that is fully consonant with the statute.

■ We briefly deal with the Commission's additional rationale for the new regulations as they apply to the handicapped, that imposing "an affirmative employment obligation on a private employer in order to cure societal ills which are unrelated to the conduct of that employer" would be unconstitutional. It cites no cases for this proposition. Indeed, it has been told by the Legislature to do just that. *Cf. Matter of State Health Plan*, 135 *N.J.* 24, 27, 637 *A.*2d 1246 (1994) ("[a]dministrative agencies owe their existence to the Legislature, which retains plenary power over them."). Furthermore, the Commission's rationale is inconsistent for if such measures are unconstitutional as to the handicapped, they would as well be so for women and racial/ethnic minorities. Finally, the claim is legally lacking in merit. *See*

*United Bldg. and Const. Trades Council of Camden County v. Mayor and Council of Camden,* 88 *N.J.* 317, 330–37, 443 *A.*2d 148 (1982), *rev'd on other grounds,* 465 *U.S.* 208, 104 *S.Ct.* 1020, 79 *L.Ed.*2d 249 (1984); *Feriozzi Co., Inc. v. Atlantic City,* 266 *N.J.Super.* 124, 628 *A.*2d 821 (Law Div.1993). We see no constitutional impediments to the type of affirmative employment measures that were previously imposed for the handicapped, but which continue for women and racial/ethnic minorities.

In view of our determination here that the reduction of affirmative employment measures for the handicapped under the current regulations constitutes an abuse of the Commission's discretion and is reflective of a too-narrow reading of the scope of *N.J.S.A.* 5:12–134, we need not, and do not, reach the alternative arguments that the new regulations constitute a denial of equal protection and are violative of the Americans with Disabilities Act, 42 *U.S.C.* § 12101 to 12213.

We recognize the difficulties expressed by the Commission in terms of obtaining reliable employment information concerning the handicapped. But we reject as unacceptable the Commission's complaint as to the lack of such information to justify the new regulations. It is the Commission's responsibility to obtain whatever information it deems necessary. The record plainly shows sources are not only available, both within State government and outside, but are anxious to provide assistance. Thus, while we do not invalidate the existing regulations, we direct the Commission to obtain the necessary data, conduct a fact-finding proceeding if deemed necessary either itself or through its Advisory Board, and promulgate new regulations that provide a reasonable measure of affirmative action for the handicapped. We decline the Commission's request to "direct [it] to amend ... specific sections of the rules...." That is its function. What it must do is provide affirmative action measures designed to obtain equal employment for the handicapped, as it did in the past, and as it has done for women and racial/ethnic minorities, but short of hiring goals unless the proceedings we direct result in information

that indicates such goals may be appropriate. We leave that, however, to the Commission's discretion. We adopt the Attorney General's suggestion that this be accomplished by the end of 1995.

Remanded to the Casino Control Commission for further proceedings consistent with this opinion. We do not retain jurisdiction.