753 A.2d 1155 (1999)
332 N.J. Super. 409
In the Matter of CHARTER SCHOOL APPEAL OF the GREATER BRUNSWICK CHARTER SCHOOL.
Superior Court of New Jersey, Appellate Division.
Submitted April 14, 1999.
Decided May 17, 1999.
*1156 Apruzzese, McDermott, Mastro & Murphy, Warren, for appellant Highland Park Board of Education (James L. Plosia, Jr., of counsel and on the brief).
Carpenter, Bennett & Morrissey, Newark, for respondent The Greater Brunswick Charter School (Lois H. Goodman and Stephen F. Payerle, of counsel; Melissa B. Popkin and Catherine A. Trinkle, on the brief).
Peter Verniero, Attorney General, attorney for respondent State Board of Education (Joseph L. Yannotti, Assistant Attorney General, of counsel; Michelle Lyn Miller, Deputy Attorney General, on the brief).
Wiley, Malehorn & Sirota, Morristown, for amicus curiae Morris School District (John G. Geppert, Jr., of counsel; Christina L. Davis, on the brief).
Before Judges KING, WALLACE and FALL.
The opinion of the court was delivered by KING, P.J.A.D.

I
In August 1997 this proposed charter school, the Greater Brunswick Charter School (Greater Brunswick or the school), filed an application on the form provided by the Department of Education (Department) to begin operations in the 1998-99 school year. Appellant represents that the charter school's application for the preceding year had been rejected by the State Board and that the school had filed, then withdrawn, an appeal to this court.
The application contemplated that the school would be a regional one, serving four districts of residence: Highland Park, New Brunswick, Edison, and Milltown. Apparently Milltown withdrew from the proposed region in December 1997. The board of education in one of the remaining three districts, Highland Park, is the appellant here. The other two districts have not appealed.
In October 1997 appellant filed its objections to the charter school with the Commissioner of Education (Commissioner), including (1) the application was defective in several respects and (2) the funding mechanism would adversely affect appellant's own efforts to meet its educational responsibilities. Signifying the deep-rooted public-policy controversy over charter schools, two of the other residence districts filed letters in support of the school's application while the fourth district joined with Highland Park in opposing it.
Two of the Department's reviewers evaluated the application's Implementation Plan, one rating it "Strong" and one rating it "Exemplary" to "Strong." The Department *1157 issued to Greater Brunswick a Review Feedback form requesting further information.
A third reviewer examined the Financial Plan, concluding that it was "A/I" (Adequate/Inadequate). A separate Review Feedback form was issued specifying needed changes in the financial plan.
The Department also issued an Evaluation Tally, summarizing the reviewers' assessments and rating the Implementation Plan as "Strong" and the Financial Plan as "A/I." The "Overall Rating" of the application was that it had the "Potential to Be Approved for CharterPending Revisions."
In response to the Department's concerns, in November and December 1997 Greater Brunswick submitted addenda to the application. Appellant responded to both addenda, again opposing the charter.
By letter of January 21, 1998 the Commissioner granted contingent approval of the charter, citing six strengths of the Implementation Plan and two of the Financial Plan. He listed eleven sets of documents which the school had to file by stated deadlines, ranging from May 15 to the opening of school. Once those documents were submitted, advised the Commissioner, the charter would be granted unconditionally.
Appellant filed a timely appeal with the State Board. In its decision mailed on April 3, 1998, the State Board summarized appellant's arguments but rejected them, employing the "boiler-plate" language used in the other appeals. In addition, the State Board noted that appellant had "challenged the Commissioner's subsequent approval of the proposed school's amendment of its region of residence by a separate appeal, which is currently pending before the State Board." We must assume this was a reference to Milltown's withdrawal from the region. None of the parties explain this further. In any event, it is not at issue on this appeal.
As with the other appeals, there is no indication of the Commissioner's issuing the "final approval" contemplated by the State Board's decision. Absent contrary contention, we must assume that the State Board's ruling is a final, appealable decision. Appellant unsuccessfully moved before the State Board for a stay.

II
Appellant board argues that the Commissioner was required to reject the application because the reviewers so recommended. It observes that the reviewers found several deficiencies, which deficiencies were never cured. And it claims that the Commissioner had no power "to override the opinions of his own evaluators" without explaining why and without gauging the application by "objective criteria."
Respondent school disputes appellant's premise that the reviewers recommended that the application be rejected. Rather, as respondent correctly notes, while each reviewer of the Implementation Plan cited some deficiencies, their overall ratings ranged from "Strong" to "Exemplary." The Department asked the school to address the various deficiencies which the school attempted to do in its two addenda in November and December 1997. Appellant filed responses to the addenda. A review of the addenda in the record shows that respondent provided detailed answers to the questions posed in the Review Feedback forms.
On this appeal appellant complains that there is no indication that the reviewers examined the addenda and made a new evaluation, or that the Commissioner reviewed the addenda and found that the deficiencies had been cured. Appellant contends it is apparent that the deficiencies with respect to curriculum were not cured.
It is true that both reviewers of the Implementation Plan found shortcomings in one of the three curriculum standards. *1158 But the other two curriculum standards were rated either "Adequate" or "Strong." And the reviewers' overall rating of the Educational Program, which included the curriculum standards, was "Strong."
As respondent and the State Board observe, neither the Act nor the regulations require that reviewers conduct a re-evaluation before the proposal goes to the Commissioner. The Commissioner alone has the power of final approval or rejection. N.J.S.A. 18A:36A-4(c). He need not reconcile any findings made at the reviewers' stage of the process, especially when, as here, those reviewers gave the application acceptable grades overall. As we discussed in the In re the Grant of the Charter School Application of Englewood on the Palisades Charter School, 320 N.J.Super. 174, 217, 727 A.2d 15 (App.Div.1999) (Englewood), the Commissioner in a charter-school-approval case is not acting in an adjudicatory capacity; hence, he need not issue the kind of formal findings and conclusions that must accompany a final decision in a traditional contested case.
Appellant also laments the alleged lack of "objective criteria" by which the Commissioner could evaluate the application. As a result, appellant complains that, the approval decision was arbitrary and capricious. Appellant offers an example of this alleged arbitrariness:
[B]oth reviewers found that Brunswick's curriculum was inadequate, yet both inexplicably deemed the overall application to be "Satisfactory". How can this be? Is not curriculum a vital if not essential component of any public school? Assuming this question must be answered in the affirmative, how can Brunswick's application have been deemed "Satisfactory" when an inadequate curriculum was offered by Brunswick?
Again, appellant's premise fails: as we explained above, both reviewers did not find that "the curriculum" as a whole was inadequate. Indeed, they rated the Education Program as being "Strong" overall.
In any event, the application itself required respondent to provide detailed information as to very specific criteria. See, e.g., the six categories of information under the Educational Program section of the application, together with respondent's detailed responses. As we concluded in the unpublished Matawan-Aberdeen (A-4713-97T1) opinion at 18-23, the approval process provided ample standards by which the application could be judged. To require further specificity would deprive the Commissioner of the discretion he needed to ensure that the proposed school will foster the goals of the Act. In sum, we affirm the Commissioner's decision over the criticism that it failed to follow the reviewers' recommendation or was based on non-objective criteria.

III
Appellant contends that the Commissioner had no authority to ask respondent for addenda to its application. By allowing the addenda, appellant reasons, the Commissioner "spoon-fed" respondent by identifying defects in the original application, giving respondent an opportunity to cure the defects. Such "remedial assistance" by the Commissioner was not authorized by the Act and was an "obvious and blatant procedural violation" which compels a reversal. Respondent and the State Board counter that addenda are permitted by the Act and regulations and are compatible with the underlying goal of promoting charter schools. The pertinent section of the Act is N.J.S.A. 18A:36A-5(n), which is the last section of the provision which lists the information that must be included in the charter-school application. This subsection provides that the application shall include "[s]uch other information as the commissioner may require." N.J.S.A. 18A:36A-5(n).
The implementing regulation is N.J.A.C. 6A:11-2.1(c): "Following the review of the applications, the Department of Education may request subsequent information as addenda *1159 to the applications." The regulations further state that the Department "shall evaluate the addenda," N.J.A.C. 6A:11-2.1(d), and that the local board of education "shall review" the addenda and submit its response. N.J.A.C. 6A:11-2.1(e).
On this appeal appellant acknowledges N.J.A.C. 6A:11-2.1(c) but reads it narrowly as forbidding the correction of any deficiencies:
However, in this case the Commissioner did not request "subsequent" information from Brunswick; rather, it requested "additional" and "revised" information from the School. In fact, what the Commissioner did was not simply request additional information but, as will be made clear below, actually provided Brunswick with an opportunity to "cure" significant deficiencies in its application. It was arbitrary and unfair for the Commissioner to have provided these multiple opportunities for Brunswick to revise and improve upon its original application. Accordingly, the Commissioner's grant of a charter to Brunswick must be reversed due to this obvious and blatant procedural violation.
We agree with the State Board that appellant's interpretation presumes the charter-school-application process is "adversarial," in which any defect in an initial filing is fatal and compels a rejection. See Englewood, 320 N.J.Super. at 195, 727 A.2d 15. A charter-school application is not analogous to a complaint in a court action which may be dismissed for insufficient pleading. The Legislature, by declaring charter schools in the public interest, N.J.S.A. 18A:36A-2, and by authorizing regulations to implement the Act, N.J.S.A. 18A:36A-18, gave the Commissioner all powers reasonably necessary to ensure that the application is complete, so that the Commissioner may properly evaluate it. While appellant is correct that the addenda procedure gives an applicant a chance to cure shortcomings, that kind of second chance is consistent with the public policy behind the Act.
Moreover, appellant was not prejudiced by the filing of the addenda. As permitted by N.J.A.C. 6A:11-2.1(e)(2), appellant filed its own responses to the addenda, neither of which response objected to the procedural propriety of the addenda. Hence the submission of addenda did not impair appellant's opportunity to have the Commissioner consider its arguments against the charter school.

IV
Appellant argues that the goals, curriculum, and student-assessment portions of the application were deficient, requiring a reversal of the grant of the charter. Appellant relies on N.J.S.A. 18A:36A-5(d), which requires, in part, that the application include "[t]he educational goals of the charter school, the curriculum to be offered, and the methods of assessing whether students are meeting educational goals." Similarly, N.J.A.C. 6A:11-2.1(b) requires that the applicant fill out the Department's form application, "which includes a description of the areas listed in N.J.S.A. 18A:36A-5."
Respondent's application included a five-page section entitled "Goals and Objectives," one goal of which was that students would "master the knowledge detailed in the New Jersey State Core Curriculum Content Standards." In the eighteen-page section entitled "Educational Program," the application described the school's curriculum philosophywhich it termed "constructivism"and which it explained, and described for each grade from "K to 9." The application then detailed the ways the school would meet each of the Core Curriculum Content Standards. Finally, in the "Student Assessment" section, the application described how student performance would be measured. As reflected by the Evaluation Tally, the consensus of the two reviewers was that the Goals and Objectives portion was "Strong" to "Adequate," *1160 the Education Program portion was "Strong," and the Student Assessment portion was "Strong." In his contingent-approval letter of January 21, 1998, the Commissioner cited the foregoing three areas as having been "well described."
Appellant complains that, notwithstanding the application's details "about how to achieve student goals (in an unspecified curriculum), there is no information provided about what students will learn and how such learning is to be measured." Apparently appellant's pointwhich is accurateis that the application does not set out subjects to be taught in each grade or the content of those subjects.
By the time we decide this appeal, the charter school in this case will have been operating for most of its first year. Obviously a specific curriculum was devised by September 1998 for opening of the school. As we stated in Englewood, 320 N.J.Super. at 195, 727 A.2d 15, it would not be in the public interest, or in the interest of the school's current students, to void the charter for any technical deficiencies in the applications. Should experience prove that the school's curriculum falls short of that required by the "t & e" obligation, any aggrieved party may pursue a remedy at that time.

V
Appellant maintains that the application should have been rejected because it failed to name a head of the school who possessed the appropriate principal's certification. The Act requires that the application include "[a] description of the charter school staff responsibilities and the proposed qualifications of teaching staff." N.J.S.A. 18A:36A-5(h). A charter school's "classroom teachers, principals and professional support staff" must hold the appropriate certificate under the regulations governing traditional public schools. N.J.S.A. 18A:36A-14(c). See also N.J.A.C. 6A:11-5.1(a).
With one exception, neither the Act nor the regulations include any other guidelines for a charter school's chief leadership position. The exception is the definitional section of the regulations, which offers a definition of "lead person":
"Lead person" means the person(s) who perform(s) the organizational tasks necessary for the operation of a charter school; and where a group of individuals shares these organizational tasks, the person designated as responsible for completion of the tasks required by these rules is the lead person.

[N.J.A.C. 6A:11-1.2.]
The regulations confer various duties on the "lead person," including coordinating pupil transportation, N.J.A.C. 6A:11-4.1 and -4.3, filing tenure charges against employees, N.J.A.C. 6A:11-6.2, and receiving pupil records from the pupil's previous school, N.J.A.C. 6A:11-8.2.
In its initial application, respondent charter school represented that the "lead person" of the school would have the title of "Director," whose qualifications included New Jersey certifications as teacher and supervisor. The application included a list of the Director's responsibilities as well as a detailed job description.
In the Review Feedback form the Department advised respondent as follows: "A lead person called principal or director must hold a New Jersey Principal License." In its first addenda respondent again labelled the "lead person" as the "Director," but it added a caveat: "If the individual chosen to head the school does not possess the required licensing to receive the `Director' or `Principal' title, the title will be Supervisor of the Greater Brunswick Charter School." In its response to the addenda, appellant objected to respondent's apparent attempt to avoid the certification requirement. In its second addenda respondent listed the title of the "lead person" as "Head of the Greater Brunswick Charter School." Appellant again objected.
*1161 On appeal appellant criticizes respondent's attempt to avoid the certification requirements by the subterfuge of changing the lead person's title to "Head," a label not among those required to carry an appropriate certification. By whatever name, reasons appellant, the leader of a charter school must hold a principal's certification.
Respondent counters that appellant's premise is wrong: the leader of a charter school does not have to be a principal or hold a principal's certificate. It points out that N.J.A.C. 6A:11-3.1 provides as follows:
(b) Any employee who is responsible for making recommendations regarding hiring or the purchase or acquisition of any property or services by a charter school shall be an administrator as defined in the School Ethics Act (N.J.S.A.18A:12-23) and the rules promulgated thereto at N.J.A.C. 6:3-9.
The referenced statute, N.J.S.A. 18A:12-23, defines "administrator" as
any officer, other than a board member, or employee of a local school district who (i) holds a position which requires a certificate that authorizes the holder to serve as school administrator, principal, or school business administrator; or (ii) holds a position which does not require that the person hold any type of certificate but is responsible for making recommendations regarding hiring or the purchase or acquisition of any property or services by the local school district; or (iii) holds a position which requires a certificate that authorizes the holder to serve as supervisor and who is responsible for making recommendations regarding hiring or the purchase or acquisition of any property or services by the local school district.
The State Board's view is that nothing in the Act requires that the top administrative position in a charter school be held by a certificated person. Rather, only teachers and professional support staff must be certified, citing N.J.S.A. 18A:36A-14(c). The State Board concludes: "Thus, Greater Brunswick's choice to employ a supervisor or headmaster which does not require certification does not render the Commissioner's determination unreasonable." The premise of the State Board's position is that the school's "lead person" in this case will not be classifiable as "professional support staff."
While respondent twice downgraded the label attached to its "lead person"from "Director" to "Supervisor" to "Head," respondent did not revise the responsibilities or job description of that person. A reading of those responsibilities and of that description indicates that the "lead person" will have the kind of wide-ranging managerial duties that are associated with a traditional principal or superintendent. For example, he supervises and evaluates staff, runs the daily operations of the school, implements the curriculum, and prepares the budget. At minimum, the leader surely qualifies as "professional support staff" within the meaning of N.J.S.A. 18A:36A-14(c).
We agree with appellant that the school's head, by whatever name, must have a certificate of some kind. Because the school began operation in September 1998, however, this sole technical defect should not void the charter where there otherwise has been substantial compliance with the Act. See Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 239-40, 708 A.2d 401 (1998); Matawan-Aberdeen (A-4713-97T1) opinion at 22-23. As a realistic remedy, we direct the Commissioner to order that the school be headed by a properly-certified lead person as of the start of the next school year, September 1999, if it is not already so headed.

VI
Appellant complains that the Charter School Program Act does not authorize a charter school to be created on a regional basis, which is the form taken by respondent charter school in this case. *1162 Hence, it reasons, the regulations that allow a regional charter school exceed the intended scope of the Act and cannot be enforced.
The Act itself does not mention regional charter schools. It authorizes formation of a charter school by, among others, "parents with children attending the schools of the district," N.J.S.A. 18A:36A-4(a), and it grants an enrollment preference "to students who reside in the school district in which the charter school is located." N.J.S.A. 18A:36A-8. Throughout, the Act uses "district" in the singular. Appellant concludes therefore: "If the Legislature had intended to authorize regional charter schools, these phrases and others like them in the statute would have been expressed in the plural."
The regulations do express a regional concept, however. The definitional section defines "district of residence" to include, in addition to the district in which a charter school is located, the "`region of residence' of contiguous district boards of education." N.J.A.C. 6A:11-1.2. "Region of residence" is defined as "contiguous district boards of education in which a charter school operates and shall be the charter school's `district of residence.'" N.J.A.C. 6A:11-1.2. Applications for regional charters must meet special requirements. N.J.A.C. 6A:11-2.1(b)(2). And the budget-per-pupil amount is computed under a special formula. N.J.A.C. 6A:11-7.1(d).
Appellant claims that to allow regional charter schools "has a tremendously deleterious effect on districts like Highland Park." First, it contends that it was not able to prepare an accurate budget for 1998-99, because "the lottery system adopted in the Administrative Code for regional charter schools calls for a `region-wide' lottery, which means that there is no maximum enrollment which can be set (or even guessed at) until the lottery is actually conducted and parents who are lottery winners have made a final decision about whether their children will attend the charter school."
Second, appellant argues that this charter school sought to regionalize because it could not generate enough interest in any single district. "Thus, Brunswick was forced by pure numerical necessity to create an unwieldy `region of residence' concept, a concept not envisioned by the Legislature but nonetheless approved by the Commissioner. It is this gerrymandered `region' which has led to the confusion and uncertainty to which Highland Park objects."
Finally, appellant contends that the lottery system will result in unfair treatment:
What Brunswick has done is take the total number of applicants from the 4 towns in question, put them in a big pool, and conduct a lottery. This could lead to Highland Park having a much higher percentage of enrollees at the School than their population or even their percentage of applicants would otherwise warrant.
Respondent charter school makes no attempt to answer appellant's pleas of hardship and unfairness. It reasons that the Act authorizes regulations "necessary to effectuate the provisions of this Act," N.J.S.A. 18A:36A-18, and that because allowing regional charter schools will foster the establishment of charter schools, the regulations allowing such schools should be upheld. It adds:
Certain school districts may not be able to support a charter school unless they join with neighboring districts. The regulations merely allow these districts to participate in the charter school program, and therefore appear to be neither arbitrary nor unreasonable.
The State Board offers an additional rationale: regional charter schools can increase the diversity of enrollment, as they can draw from both urban and suburban districts and from districts with different racial, ethnic, and economic characteristics. With regard to appellant's concerns about budgeting, the State Board points out that uncertainty over enrollment inheres in the *1163 charter-school concept itself; it is not unique to the regionalization feature. And the State Board claims, without support in the record, that "the Department has taken great steps to assist school districts to make appropriate budgetary plans based upon statistical calculations and projections."
We conclude that a regional charter school is a logical variant of the kind of charter school permitted by the Act. If a charter school established to serve a single district may enroll students from other districts, as permitted by N.J.S.A. 18A:36A-8(a), then a charter school should be allowed to serve a region or collection of districts, as opposed to a single district. While appellant reasonably complains of budgetary headaches, these annoyances are a function of the charter-school concept itself. Appellant's complaint, in that respect must be directed to the Legislature or the Executive Branch, not the courts. Englewood, 320 N.J.Super. at 226-27, 727 A.2d 15. We conclude that the regulations allowing regional charter schools are a legitimate means of effectuating the Act's purpose of encouraging the establishment of charter schools.

VII
Appellant contends that the charter grant must be overturned because the Commissioner failed to consider the charter school's adverse impact on the financial health of appellant's district. Like most of the appellants in the other charter-school appeals, appellant here cites four ways in which it will be harmed: 1) the amount it must pay to the charter school will not be matched by savings in its own costs; 2) it may have to pay for some students who were not enrolled in its district the year before; 3) the financial drain "may" impair appellant's ability to meet its "t & e" obligations; and 4) these effects will occur without approval by the voters in the district. While we find appellant's protestations deserving of concern, they are in the nature of disagreements with the Legislature's choice of educational policy, as to which there is no judicial remedy. Dennery v. Board of Educ., 131 N.J. 626, 643, 622 A.2d 858 (1993); In re Petition, Union County Reg'l High School Dist. No. 1, 298 N.J.Super. 1, 9, 688 A.2d 1082 (App.Div.), certif. denied, 149 N.J. 37, 692 A.2d 50 (1997). In Englewood, 320 N.J.Super. at 225-27, 727 A.2d 15 we addressed and rejected all four of the theories here asserted by this appellant.

VIII
Appellant complains that the Commissioner was required but did not consider the racial impact that the charter school will have on appellant's district. To the extent the Charter School Program Act does not mandate consideration of such racial impact, appellant argues, the Act is unconstitutional. Appellant invites comparison of this Act to the statute governing the termination of a sending-receiving relationship, which requires that a feasibility study be presented to the Commissioner in order to show, among other things, the effect on the racial mix of the districts involved. N.J.S.A. 18A:38-13. Appellant finds "no logical reason" why the same factor should not be a prerequisite to the approval of a charter, given that an exodus of white students from appellant's district would substantially skew the racial balance in that district. Appellant concedes that it "does not know" if there will be such an adverse impact in fact, because it did not know as of September 11, 1998, the filing date of its brief, what the racial composition of the charter school will be for the 1998-99 year. We do note that in neither of appellant's two reply briefs, the last filed in January 1999, does it venture to suggest actual race-population figures; in both reply briefs appellant reiterates only the theoretical bases of its racial-factor argument.
As we noted in rejecting this argument in the Matawan-Aberdeen (A-4713-97T1) appeal at 10-13, appellant's complaint is premature: if and when the existence of *1164 the charter school unduly skews the racial mix in appellant's district, the Commissioner has the powerindependently of the Charter School Program Actto take remedial action. N.J.S.A. 18A:6-9; Jenkins v. Township of Morris Sch. Dist., 58 N.J. 483, 501, 506-07, 279 A.2d 619 (1971), Board of Educ. of Bor. of Englewood Cliffs v. Board of Educ. of City of Englewood, 257 N.J.Super. 413, 473-74, 608 A.2d 914 (App.Div.1992), aff'd, 132 N.J. 327, 625 A.2d 483, cert. denied, 510 U.S. 991, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993). But there is nothing in the Charter School Program Act that requires unconstitutional conduct; we may not declare it facially invalid. See Feriozzi Co. Inc. v. Atlantic City, 266 N.J.Super. 124, 136-37, 628 A.2d 821 (Law Div.1993) (a law is not invalid on its face if it permits, but does not require, unconstitutional conduct; a court may not assume that an act will be applied in an unconstitutional manner). Appellant has not established that the Act is unconstitutional for failing to compel consideration of race in the approval-decision process.
Affirmed.