**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3415-16T1

NORTH BRUNSWICK TOWNSHIP
BOARD OF EDUCATION, NEW
BRUNSWICK BOARD OF EDUCATION,
and PISCATAWAY TOWNSHIP BOARD
OF EDUCATION,

     Petitioners-Appellants,

v.

KIMBERLY HARRINGTON, ACTING
COMMISSIONER OF EDUCATION,
NEW JERSEY STATE BOARD OF
EDUCATION and CENTRAL JERSEY
COLLEGE PREP CHARTER SCHOOL,

     Respondents-Respondents.
_____

          Argued May 30, 2019 – Decided June 7, 2019

          Before Judges Haas, Sumners and Mitterhoff.

          On appeal from the New Jersey Department of
          Education.

          David B. Rubin argued the cause for appellants (David
          B. Rubin, PC, and The Busch Law Group, LLC,
          attorneys; David B. Rubin and Douglas M. Silvestro,
          on the briefs).

Brenda C. Liss argued the cause for respondent Central Jersey College Prep Charter School (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Brenda C. Liss, of counsel and on the brief; Stephen M. Turner, on the brief).

Geoffrey N. Stark, Deputy Attorney General, argued the cause for respondent Commissioner of Education (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; James M. Esposito, Deputy Attorney General, on the brief).

PER CURIAM

Appellants North Brunswick Township Board of Education (North Brunswick), New Brunswick Board of Education (New Brunswick), and Piscataway Township Board of Education (Piscataway) (collectively appellants), appeal from the February 28, 2017 final decision of the Commissioner of Education (Commissioner), approving an application by Central Jersey College Prep Charter School (CJCP) to amend its charter to increase its enrollment, add a satellite campus, and move its Somerset campus to a new facility.[1]  We affirm.

---

[1]  Calendared back-to-back with this appeal, Franklin Township Board of Education (Franklin) separately appealed from this same decision.  In re Approval of Charter Amendment of Cent. Jersey Coll. Prep (Central Jersey), No. A-3074-16.  Two other appeals from final decisions by the Commissioner

I.

The procedural history and facts of this case are fully set forth in our decision today in Central Jersey and, to avoid repetition, we incorporate that discussion here. Therefore, we need only recite the most salient facts in this opinion.

At the time of this appeal, there were five charter schools operating in Middlesex and Somerset Counties: CJCP and Thomas Edison EnergySmart Charter School (TEECS) in Franklin Township; Hatikvah International Academy Charter School (Hatikvah) in East Brunswick; Greater Brunswick Charter School in New Brunswick; and the Academy for Urban Leadership Charter School in Perth Amboy. A sixth school, Ailanthus Charter School, had received approval to begin operation in Franklin Township for the 2018-2019 school year. See In re Ailanthus Charter Sch., No. A-0945-16 (App. Div. May 11, 2018). No charter schools were located in Piscataway.

As discussed in detail in Central Jersey, on December 1, 2016, CJCP submitted a charter amendment application to the Department seeking to: 1)

are also calendared back-to-back with this appeal. Highland Park Bd. of Educ. v. Harrington (Highland Park II), No. A-3455-16; Bd. of Educ. of Twp. of Piscataway v. N.J. Dep't of Educ. (Piscataway), No. A-5427-16. Because of this overlap, the reader is encouraged to review all four of our opinions in these cases, which are being released simultaneously.

expand its maximum enrollment from 624 to 1320 students by the 2019-2020 school year; 2) add a satellite campus in New Brunswick (within its region of residence) by the 2019-2020 school year; and 3) relocate its current facility to a new facility on Mettlers Road in Somerset.

On January 13, 2017, Franklin Township Board of Education (Franklin) submitted a letter, also discussed in detail in Central Jersey, to the Commissioner asking her to deny CJCP's application. In January and February 2017, appellants North Brunswick and Piscataway passed almost identical resolutions for a general moratorium on new charter school seats in Middlesex and Somerset Counties. They asserted that the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18 (Charter School Act or CSPA), "requires that the districts of residence pay the charter schools for each student from their respective communities enrolled in those schools, thereby draining funds and diminishing money available to serve students in the traditional public schools."

Further, North Brunswick and Piscataway stated that the New Jersey Department of Education (Department or NJDOE) "has interpreted the Act to require all public schools statewide to pay charter schools for students enrolled in those schools regardless as to whether the charter serves that district's community as part of the charter's approved district or region of residence."

They also alleged that Hatikvah and TEECS, but not CJCP, enrolled a "significantly more segregated student body than any of the resident or non-resident sending districts with respect to race, socioeconomic status and need for special education."

By letter dated February 21, 2017, appellant New Brunswick also asked the Commissioner to deny CJCP's, TEECS's and Hatikvah's applications to expand their enrollment. It maintained that in "direct contradiction to the letter and spirit" of the CSPA, "many charter schools are seeking to expand in order to enroll additional students from districts outside of the charter schools' approved districts or regions of residence due to a lack of interest from students who live in the very communities for which the charters were created to serve." It claimed that "[a]ny increase in charter school seats will have a negative impact on public school district funding, with the proposed 128% increase in such seats in Middlesex and Somerset Counties likely to lead to drastic and debilitating cuts throughout the public school districts in those counties."

New Brunswick also noted that other entities had filed civil rights complaints against two charter schools in Franklin Township (presumably referring to CJCP and TEECS) alleging that the demographics of the charter schools did not reflect the demographics of the local school district. It similarly

5

alleged that Hatikvah and TEECS, but not CJCP, enrolled a "significantly more segregated student body than any of the resident or non-resident sending districts with respect to race, socioeconomic status and need for special education."

On February 28, 2017, the Commissioner granted CJCP's application to amend its charter based on her review of the record. In her written decision, the Commissioner noted that the Department had "completed a comprehensive review including, but not limited to, student performance on statewide assessments, operational stability, fiscal viability, public comment, fiscal impact on sending districts, and other information in order to make a decision regarding the school's amendment request." The Commissioner confirmed the school's maximum enrollment for the "approved region of residence of Franklin, New and North Brunswick," as follows:

| Grade | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|
| Kindergarten | 72 | 96 | 96 |
| Grade 1 | 72 | 96 | 96 |
| Grade 2 | 72 | 96 | 96 |
| Grade 3 | 48 | 72 | 96 |
| Grade 4 | | 48 | 72 |
| Grade 5 | | | 48 |
| Grade 6 | 72 | 168 | 168 |
| Grade 7 | 48 | 144 | 168 |
| Grade 8 | 48 | 48 | 144 |
| Grade 9 | 48 | 120 | 120 |
| Grade 10 | 48 | 48 | 120 |
| Grade 11 | 48 | 48 | 48 |
| Grade 12 | 48 | 48 | 48 |
| **Total** | **624** | **1032** | **1320** |

The Commissioner also confirmed the new site location at Mettlers Road, and directed CJCP to "provide all facility related documents to the Office of Charter and Renaissance Schools and the Somerset County Office of Education."  Further, the Commissioner directed that once CJCP had identified the final site of the satellite campus, it should provide the Department with the required amended documentation pursuant to N.J.A.C. 6A:11-2.6.  This appeal followed.

On appeal, appellants raise the following contentions:

POINT I

The Commissioner Failed To Analyze CJCP's Application Or To Disclose The Basis For Her Approval.

POINT II

The Commissioner Failed To Consider The Segregative Impact of CJCP's Charter Amendment.

POINT III

Other Significant Deficiencies [I]n CJCP's Application Render The Commissioner's Approval Arbitrary, Capricious And Unreasonable.

POINT IV

There Is No Authority To Compel Piscataway To Fund Students' Attendance [A]t CJCP.

7

II.

In Point I, appellants argue that the Commissioner's decision approving CJCP's application for an amendment of its charter was arbitrary, capricious, or unreasonable because she failed to analyze CJCP's application to amend, or provide any reason for the approval. We disagree.

As a threshold matter, CJCP argues that the appeal filed by Piscataway (but not New Brunswick's and North Brunswick's appeals) must be dismissed because Piscataway, as a non-resident district, lacks standing to pursue it. However, in our decision today in Highland Park II, we held that Piscataway had standing to challenge the Commissioner's decision to grant Hatikvah's application for an amendment to its charter. We discern no basis for reaching a different conclusion in this case where Piscataway seeks to challenge CJCP's similar application in the same county. Because we reject CJCP's standing argument for the reasons expressed in Highland II, we do not discuss this contention further here. R. 2:11-3(e)(1)(E).

Turning to the merits of appellants' contentions concerning the sufficiency of the Commissioner's decision, charter schools are public schools that operate under a charter granted by the Commissioner, operate independently of a local board of education, and are managed by a board of trustees. N.J.S.A. 18A:36A-

3(a).[2]  Applications to establish a charter school are governed by N.J.S.A. 18A:36A-4 and -5, and the implementing regulation, N.J.A.C. 6A:11-2.1.  The Commissioner has final authority to grant or reject a charter.  N.J.S.A. 18A:36A-4(c).  "The notification to eligible applicants not approved as charter schools shall include reasons for the denials."  N.J.A.C. 6A:11-2.1(f) (emphasis added).

Applications to renew a charter are governed by N.J.S.A. 18A:36A-17, and the implementing regulation, N.J.A.C. 6A:11-2.3.  The Commissioner shall grant or deny the renewal of a charter based upon a comprehensive review of the school, including, among other things, the annual reports, recommendation of the district board of education or school superintendent, and student performance on statewide tests.  N.J.A.C. 6A:11-2.3(b).  "The notification to a charter school that is not granted a renewal shall include reasons for the denial."  N.J.A.C. 6A:11-2.3(d) (emphasis added).

At issue here, a charter school can also apply to the Commissioner for an amendment to its charter.  N.J.A.C. 6A:11-2.6.  A charter school can seek, as in this case, an expansion of enrollment and the establishment of a satellite campus.  N.J.A.C. 6A:11-2.6(a)(1)(i), (iv).  Similar to the initial approval process, boards of education in the district of residence can submit comments in response to the

---

[2]  We discuss the CSPA in more detail in our decision in Highland Park II.

application for amendment.  N.J.A.C. 6A:11-2.6(c).

"The Commissioner may approve or deny amendment requests of charter schools and shall notify charter schools of decisions.  If approved, the amendment becomes effective immediately unless a different effective date is established by the Commissioner."  N.J.A.C. 6A:11-2.6(d).  In determining whether the amendments are eligible for approval, the Department "shall evaluate the amendments" based on the CSPA and the implementing regulations, and the Commissioner "shall review a charter school's performance data. . . ."  N.J.A.C. 6A:11-2.6(b).  A school's performance data is reflected in the school's Academic Performance Framework report.  N.J.A.C. 6A:11-1.2.  The Performance Framework consists of three sections:  academic, financial, and organizational.  N.J.A.C. 6A:11-1.2.  A charter school's performance on the academic section carries the most weight.  That component includes measures of student growth, achievement, graduation rate, and attendance.  N.J.A.C. 6A:11-1.2.

On appeal, this court may reverse the Commissioner's decision on a charter school application only if it is "arbitrary, capricious, or unreasonable."  In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013).  In making that determination, our review is generally restricted

to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"[T]he arbitrary, capricious, or unreasonable standard . . . subsumes the need to find sufficient support in the record to sustain the decision reached by the Commissioner." Id. at 386. "[A] failure to consider all the evidence in a record would perforce lead to arbitrary decision making." Ibid. However, in cases where "the Commissioner is not acting in a quasi-judicial capacity," and is instead acting in [her] legislative capacity, as [s]he was doing here, [s]he "need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." TEAM Acad., ___ N.J. Super. ___ (slip op. at 30) (quoting In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000)).

Thus, although the arbitrary, capricious, or unreasonable standard

11

demands "that the reasons for the decision be discernible, the reasons need not be as detailed or formalized as an agency adjudication of disputed facts; they need only be inferable from the record considered by the agency." Englewood, 320 N.J. Super. at 217. See Red Bank, 367 N.J. Super. at 476 (reasons need not be detailed or formalized, but must be discernible from the record); Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. State Bd. of Educ., 172 N.J. Super. 547, 552 (App. Div. 1980) (detailed findings of fact not required by Commissioner in reducing amount school board sought to increase its budget).

There is also no statutory or regulatory provision requiring the Commissioner to include reasons for granting an application to amend. The regulations provide only that the notification "shall include reasons for the denial[]" of an initial charter school application, N.J.A.C. 6A:11-2.1(f), and an application for renewal, N.J.A.C. 6A:11-2.3(d). The Commissioner does however, take comments regarding the amendment into consideration when rendering a final decision. N.J.A.C. 6A:11-2.6(c).

To that end, Quest Academy, 216 N.J. at 390, as cited by appellants, is distinguishable. In that case, the operator of a proposed charter school appealed from the Commissioner's decision denying the charter. Id. at 373. The Commissioner's initial decision was "short on detail with respect to the

application's deficiencies." Ibid. However, after the appeal was filed, the Commissioner submitted a written amplification of his reasons for denying the application. Id. at 374. The Court affirmed, finding in relevant part that:

> Although the letter of denial did not detail the deficiencies found in the application, it offered instead a face-to-face meeting to review in detail the shortcomings in the application that Quest Academy submitted. According to the Commissioner, the large number of applicants (forty-five) who were reviewed in the batch with Quest Academy rendered lengthy written responses difficult and taxing of precious departmental resources. While it would be naturally preferable from the applicant's perspective to receive initially more than a generic form letter denying an application, here Quest Academy received a bit more than that. Some information about the application's shortcomings was provided in the denial letter, and the subsequent amplification fully detailed those issues. In reviewing as complex a proposal as that required for a newly proposed charter school, there is a benefit to offering a discussion, instead of a written cataloguing, of mistakes or deficiencies in the application that has been rejected. We do not fault the Commissioner for choosing a dialogue involving constructive criticism as her preferred approach for producing approvable applications when resubmitted.
>
> [Id. at 390.]

As we discussed in our decisions in Highland Park II and Central Jersey, Quest Academy is distinguishable because there is no requirement that the Commissioner detail her findings in approving an amendment. See also TEAM

13

Acad., ___ N.J. Super. ___ (slip op. at 40). Instead, the focus on review is whether the reasons for the Commissioner's decision are clearly discernible from the record. Red Bank, 367 N.J. Super. at 476.

Here, the record supports the Commissioner's decision approving CJCP's request to amend its charter. Most notably, it is undisputed that CJCP's performance data, a significant factor in assessing a request to amend a charter, N.J.A.C. 6A:11-2.6(b), was, as represented by its students' PARCC scores, significantly higher than the State average. It was also undisputed that CJCP is a high-performing, Tier 1 school, a ranking it received from the Department's assessment of its academic performance based on the metrics set forth in the State's Academic Performance Framework governing charter schools. N.J.A.C. 6A:11-1.2; N.J.A.C. 6A:11-2.3(b).

Further, the record shows that CJCP, which has been submitting detailed annual reports to the Commissioner since it was approved to operate in 2006, and had submitted financial audits prior to having its charter renewed, was organizationally sound and fiscally viable. N.J.S.A. 18A:36A-16(b); N.J.A.C. 6A:11-2.2. As discussed more fully in Central Jersey, there was also a need for the increase in enrollment because there were 628 students on its waiting list and there was a "heavy demand from the community" to enroll in the charter

school.  Adding a satellite campus in New Brunswick would further allow for the "accessibility and replication" of CJCP's existing model to service that high-needs community.  Lastly, the Commissioner approved CJCP's request to expand enrollment with the understanding that facilities would need to be identified, secured, and potentially improved to comply with the charter regulations.

Therefore, we again conclude that the Commissioner's decision to approve CJCP's application was not arbitrary, capricious, or unreasonable because it promoted the legislative policy of developing charter schools and was supported by the record.  Therefore, we reject appellants' contentions on this point.

### III.

In Point II, appellants argue that the Commissioner's decision was arbitrary, capricious, and unreasonable because she failed to consider the alleged segregative impact of CJCP's charter amendment on the district.  Franklin raised this identical issue in Central Jersey, in its appeal from the same February 28, 2017 decision involved in the present appeal.  For the reasons set forth in our decision in Central Jersey, we reject appellants' similar contention in this companion appeal, and add the following comments addressing appellants'

15

specific arguments concerning this issue.  R. 2:11-3(e)(1)(E).

Appellants argue that CJCP's demographics do not reflect a cross section of the community's school age population.  They contend that CJCP over-enrolled Asian students and under-enrolled Hispanic students, economically disadvantaged students (defined as students receiving free or reduced cost lunch), ELL students, and special needs students, when compared to the populations in the Franklin, North Brunswick, and New Brunswick school districts.

Before the Commissioner, however, appellants only asserted that Hatikvah and TEECS, but not CJCP, enrolled a "significantly more segregated student body than any of the resident or non-resident sending districts with respect to race, socioeconomic status and need for special education."  Further, Franklin only asserted that CJCP had a "poor track record" with ELL students, and presented no evidence to the Commissioner regarding the racial and economic segregative effects of CJCP's increased enrollment.

Appellants argue that the Commissioner's decision granting the expansion of enrollment is arbitrary and capricious because "there is nothing discernable" in either her decision or the record to suggest that she considered its assertions that CJCP enrolled a significantly more segregated student body than any of the

16

resident or non-resident school districts. However, as set forth above and in our decision in <u>Central Jersey</u>, the Commissioner was not required to include reasons for granting the application to amend the charter. <u>See</u> <u>Red Bank</u>, 367 N.J. Super. at 476 (Commissioner did not specifically address the segregation argument in his letter approving the Charter School's renewal and expansion). Nor did appellants present to the Commissioner sufficient evidence of a segregative effect to warrant more in-depth scrutiny. <u>Id.</u> at 472-85.

Further, appellants' unsubstantiated generalized protests regarding the segregative effect of CJCP's application to increase enrollment did not provide a basis to deny the application. <u>Ibid.</u> It is undisputed that CJCP accepts applications from all interested students and operates a publicly held random lottery process that blindly accepts a certain number of applicants to fill available seats per grade. CJCP does not collect any information at the time of the application from the applicants regarding students' socioeconomic and ethnic background, disability status, and English language skills.

Nonetheless, on appeal, appellants submitted school enrollment and census data for Franklin, North Brunswick, and New Brunswick school districts, which it contends for the first time shows that CJCP is becoming increasingly segregated and does not reflect the demographics of the local community:

| Asian Students | School Year 2010-2011 | School Year 2016-2017 |
|---|---|---|
| Franklin Township | 20% | 16% |
| New Brunswick | ≤1% | ≤1% |
| North Brunswick | 28% | 25% |
| CJCP | 3% | 38% |

| District or School | Hispanic Students 2016-2017 | Free or Reduced Lunch Students 2016-2017 | LEP[3] Students 2016-2017 | Students with Special Needs 2016-2017 |
|---|---|---|---|---|
| Franklin | 31% | 48% | 8% | 19% |
| New Brunswick | 89% | 60% | 19% | 17% |
| North Brunswick | 32% | 41% | 4% | 15% |
| CJCP | 18% | 24% | 0% | 7% |

Appellants argue that the "collective weight of this data is prima facie proof that CJCP does not reflect 'a cross section of the community's school age population including racial and academic factors'" (quoting N.J.S.A. 18A:36A-8).

However, on appeal, the Commissioner stated that she had analyzed the potential impact CJCP's expansion would have on racial demographics within the District by reviewing enrollment trends in New Brunswick and North Brunswick, and determined that the student demographics have stayed relatively static over the past few years:

| Students Pre-K to 12 | North Brunswick 2010-2011 | North Brunswick 2016-2017 | New Brunswick 2010-2011 | New Brunswick 2016-2017 |
|---|---|---|---|---|
| White | 26.8% | 18.8% | 1.1% | 0.8% |
| Black | 20.0% | 21.3% | 15.1% | 9.7% |
| Asian | 28.7% | 25.1% | 0.8% | 0.4% |
| Hispanic | 24.0% | 32.5% | 82.6% | 88.8% |

---

[3] Limited English proficiency students.

| | | | | |
|---|---|---|---|---|
| LEP | 3.9% | 4.4% | 16.3% | 18.7% |
| Special needs | 14.4% | 15% | 9.3% | 16.8% |
| Free or reduced lunch | 29.4% | 41.1% | 79.5% | 59.7% |

Thus, even if appellants had presented the information about student enrollment and district demographics to the Commissioner prior to her February 28, 2017 decision, it would not have provided a basis to reject the application. The data provided above shows some disparity between the enrollment of Asian, Hispanic, LEP, special needs, and economically disadvantaged students and the students in the population in North Brunswick and New Brunswick. Significantly, however, appellants do not argue that the school districts are becoming more segregated and in fact, the data submitted by the Commissioner indicates that they have not. See Bd. of Educ. of Hoboken v. N.J. State Dep't of Educ., No. A-3690-14 (App. Div. June 29, 2017) (slip op. at 15) (affirmed charter renewal where there were no allegations that the charter school's practices after the enrollment of students by an impartial lottery exacerbated the racial or ethnic balance).

A comparison of the demographic data indicates that CJCP enrolled a diverse student population. Moreover, CJCP maintained that the expansion and the operation of a satellite campus in New Brunswick would allow it to develop an even more diverse student population. To that end, appellants have not

19

presented any evidence that the District was becoming more segregated, or that CJCP's existence has worsened the existing racial imbalance. See ibid.[4]

Finally, we note, as we did in our decision in Central Jersey, that it is undisputed that the Commissioner considered the segregative effect of the charter school in approving CJCP's charter in 2006, N.J.A.C. 6A:11-2.1(j), in renewing its application, N.J.A.C. 6A:11-2.3(b)(8), and on an annual basis, N.J.A.C. 6A:11-2.2(c). There is no indication in this record that there was any challenge based on the segregative effect, nor was there any indication in this record that the Commissioner found a segregative effect during the annual review. N.J.A.C. 6A:11-2.2(c).

Because appellants did not provide sufficient evidence of a segregative effect to warrant either more detailed scrutiny or the denial of the application, we reject their contention that the Commissioner's decision was arbitrary, capricious, and unreasonable.

---

[4] As discussed in our decision today in Central Jersey, this matter is distinguishable from Red Bank, 367 N.J. Super. at 462, and two other cases specifically cited by appellants, In re Petition for Authorization to Conduct a Referendum on Withdrawal of N. Haledon Sch. Dist. from Passaic Cty. Manchester Reg'l High Sch. Dist., 181 N.J. 161, 183 (2004), Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J. Super. 413, 459-65 (App. Div. 1992), aff'd, 132 N.J. 327, cert. denied, 510 U.S. 991 (1993). Because we discuss these cases in detail in Central Jersey, we need not repeat that discussion again here. R. 2:11-3(e)(1)(E).

IV.

Turning to Point III, appellants argue that the Commissioner's decision approving the amendment was arbitrary, capricious, and unreasonable because she failed to consider "significant deficiencies in CJCP's application." Specifically they argue that the Commissioner failed to consider: 1) the financial burden of the expansion on the sending districts; 2) the lack of sufficient demand for the increased enrollment in the region of residence; 3) the lack of interest for a satellite campus; 4) that CJCP's staffing plan was unrealistic; and 5) that the proposed location of the Somerset campus was unsuitable for a school. Franklin raised some of these same arguments in Central Jersey, and we rejected them. We reach the same conclusion here and also address appellants' slightly different presentations on these issues.

First, appellants argue that the Commissioner failed to consider the financial burden of the expansion on the sending districts. However, the Commissioner relied on the Department's "comprehensive review," which included the "fiscal impact on sending districts." Moreover, appellants did not "demonstrate[] with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized by [the district's] loss" of the funds to be allocated to a charter school. Quest Acad., 216 N.J. at 377-

78 (quoting Englewood, 164 N.J. at 334-35). Nor did they account for the fact that although appellants have to pay CJCP 90% of certain student funding categories, they retain 10%—an amount designed to respond to concerns about the loss of funding to the District. Englewood, 164 N.J. at 333; N.J.S.A. 18:36A-12(b). Thus, the Commissioner was not "obligated to evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education." Ibid.

Second, appellants contend that the Commissioner failed to consider the lack of demand in the region of residence for the increased enrollment, as represented by its acceptance of non-resident students. However, as set forth in our decision in Central Jersey, CJCP had 628 students on its waiting list at the time of the application, and anticipated that approximately 94% of its students would reside in its region of residence in the 2017-2018 school year, and 100% by the 2018-2019 school year. Therefore, we reject appellants' contention.

Third, appellants contend that CJCP's "justification for opening a satellite campus in New Brunswick is baffling." However, a charter school can seek an amendment to open a new satellite campus. N.J.A.C. 6A:11-2.6(a)(1)(iv). See Educ. Law Ctr. ex rel. Burke v. N.J. State Bd. of Educ., 438 N.J. Super. 108, 112 (App. Div. 2014) (affirmed State Board's action in adopting regulations

allowing satellite campuses). A satellite campus is defined as "a school facility operated by a charter school that is in addition to the facility identified in the charter school application or charter, if subsequently amended." N.J.A.C. 6A:11-1.2. "A charter school may operate more than one satellite campus in its district or region of residence, subject to charter amendment approval, pursuant to N.J.A.C. 6A:11-2.6." N.J.A.C. 6A:11-4.15(b).

The Department evaluates whether amendments are eligible for approval based on the CSPA. N.J.A.C. 6A:11-2.6(b). Under the CSPA, a school must include information showing a "[d]emonstration of need" in its initial application for a charter. N.J.A.C. 6A:11-2.1(b)(2)(vi). As addressed in Central Jersey, CJCP presented a detailed rationale for the addition of a satellite campus—a record that amply supports the Commissioner's decision. Notably, CJCP set forth that New Brunswick's high percentage of economically disadvantaged students (86% (high school) and 93% (middle school)), would benefit from easier access to CJCP. It also cited to a study that "emphasize[d] the importance of residential proximity for charter schools to be a real option for all parents."

CJCP further demonstrated need because even though CJCP received fewer applications than expected from New Brunswick students in 2016-2017,

23

it still received double the number of applications from 2015-2016, and seventy-seven of the ninety-three students were placed on the waiting list. It also represented that the total number of applications had dramatically increased over the past few years (465 for the 2014-2015 school year and 956 for the 2016-2017 school year), and that at the time of the application, there were 628 students on its waiting list. Therefore, appellants' contrary contention lacks merit.

Fourth, appellants argue that the Commissioner failed to address its concern as to the insufficiency of its staffing budget. However, as set forth in Central Jersey, there is no indication in this record that CJCP proposed to pay its teachers less than the amount required under the CSPA. In this regard, N.J.S.A. 18A:36A-14(b) provides that "[a] charter school shall not set a teacher salary lower than the minimum teacher salary specified pursuant to section 7 of P.L.1985, c.321 (C.18A:29-5.6) nor higher than the highest step in the salary guide in the collective bargaining agreement which is in effect in the district in which the charter school is located." See also 34 N.J.R. 2920(a) (Aug. 19, 2002) ("Charter schools pay their teachers and professional staff not less than the State minimum salary nor more than the salaries of the district boards of education in which the charter schools are located.").

Lastly, appellants argue that the Commissioner ignored serious safety

concerns about the Mettlers Road location. However, prior to opening the new campus, CJCP must submit to the NJDOE the new lease, mortgage, or title to the facility, a valid certificate of occupancy for educational use issued by the local municipal enforcing official, a sanitary inspection report with a satisfactory rating, and a fire inspection certificate with an "Ae" (education) code life hazard. N.J.A.C. 6A:11-2.1(i)(6)-(9). The regulations are designed to ensure that facilities are safe for students.

Thus, none of the issues raised by appellants in this section of their brief present a basis for disturbing the Commissioner's decision.

V.

Finally, appellants argue in Point IV, as the challengers unsuccessfully did with respect to Hatikvah in Highland Park II and Piscataway, that there is no statutory authority under the CSPA to obligate Piscataway to fund its students' attendance at CJCP and thus, the Commissioner's decision was arbitrary, capricious, or unreasonable because it violated express or implied legislative policies. They contend that N.J.S.A. 18A:36A-12(b) explicitly limits financial responsibility for students' attendance at charter schools to the "school district of residence," which they interpret to mean the district where the charter school is located, or at most, the contiguous districts identified in the school's

approved "region of residence."

Unlike New Brunswick and North Brunswick, Piscataway is not included in CJCP's district or region of residence. Thus, appellants argue that since the Commissioner's approval of the expansion was based in part on the presumed ongoing flow of revenue from Piscataway, it was inherently arbitrary and should be vacated. This contention continues to lack merit. Nevertheless, we fully address it here.

Appellants in their resolutions calling for a moratorium on all new charter school seats in Middlesex and Somerset Counties only generally claimed that the Department had interpreted the CSPA "to require all public school districts statewide to pay charter schools for students enrolled in those schools regardless as to whether the charter serves the district's community as part of the charter's approved district or region of residence." Thus, the Commissioner did not address this issue in approving CJCP's application to amend its charter.

The scope of judicial review of a final decision of the Commissioner is limited. Quest Acad., 216 N.J. at 385. Although the Appellate Division is not bound by an agency's determination on a question of law, Hargrove v. Sleepy's, LLC, 220 N.J. 289, 301 (2015), "[c]ourts afford an agency 'great deference' in reviewing its 'interpretation of statutes within its scope of authority and its

adoption of rules implementing' the laws for which it is responsible." N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)).

"[T]he goal of statutory interpretation is to ascertain and effectuate the Legislature's intent." Cashin v. Bello, 223 N.J. 328, 335 (2015). "[T]he best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "Accordingly, '[t]he starting point of all statutory interpretation must be the language used in the enactment.'" Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) (quoting N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 178 (2014)). Courts "construe the words of a statute 'in context with related provisions so as to give sense to the legislation as a whole.'" Spade, 232 N.J. at 515 (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017)). If the plain language leads to a clear and unambiguous result, then the court's "interpretative process is over." Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016). Courts "turn to extrinsic tools to discern legislative intent . . . only when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with a general statutory scheme." Shelton

v. Restaurant.com, Inc., 214 N.J. 419, 429 (2013).

At issue here, as it was in Highland Park II, N.J.S.A. 18A:36A-12(b) provides that:

> The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil, the prebudget year general fund tax levy per pupil inflated by the CPI rate most recent to the calculation, and the employer payroll tax per pupil that is transferred to the school district pursuant to subsection d. of section 1 of P.L.2018, c.68. In addition, the school district of residence shall pay directly to the charter school the security categorical aid attributable to the student and a percentage of the district's special education categorical aid equal to the percentage of the district's special education students enrolled in the charter school and, if applicable, 100% of preschool education aid. The district of residence shall also pay directly to the charter school any federal funds attributable to the student.
>
> [(Emphasis added).]

The term "school district of residence" is not defined in the CSPA or the implementing regulations. The term "district of residence" is defined in the regulations as "the school district in which a charter school facility is physically located; if a charter school is approved with a region of residence comprised of contiguous school districts, that region is the charter school's district of

28

residence." N.J.A.C. 6A:11-1.2; N.J.A.C. 6A:23A-15.1.[5] A school district does not, however, reside in a district, it is located in a district. Moreover, the district of residence where the charter school is located does not receive equalization aid, security categorical aid, or federal funds "attributable" to a charter student who is not a resident of that district. See N.J.S.A. 18A:7F-43 to -63 (SFRA). Thus, it would make no sense to interpret "school district of residence" to mean the "district of residence." N.J.S.A. 18A:36A-12(b).

In fact, the State Board of Education promulgated N.J.A.C. 6A:23A-15.2 and -15.3, which as discussed in more detail in our decision in Piscataway, require both a "district of residence" and a "non-resident district" to fund its students' attendance at a charter school. However, appellants argue that under N.J.A.C. 6A:23A-15.2 and -15.3, a "non-resident district" should be interpreted to mean only those "non-resident districts" that are within a charter school's region of residence because those districts would be entitled to the same

_____

[5] A "region of residence" is defined as the "contiguous school districts in which a charter school operates and is the charter school's district of residence." N.J.A.C. 6A:11-1.2. See In re Charter Sch. Appeal of Greater Brunswick Charter Sch., 332 N.J. Super. 409, 424 (App. Div. 1999) ("[R]egulations allowing regional charter schools are a legitimate means of effectuating the Act's purpose of encouraging the establishment of charter schools."). A non-resident school district is defined as "a school district outside the district of residence of the charter school." N.J.A.C. 6A:11-1.2.

opportunity for input as the district where the charter school is located. N.J.A.C. 6A:11-2.1; N.J.A.C. 6A:11.2.6. They contend that the Department's interpretation of the CSPA to require all non-resident districts to fund their students' attendance at charter schools is inconsistent with that Act because non-resident districts located outside the approved region of residence are not entitled to receive notice or input as to the approval or amendment process.

Significantly, after the parties filed briefs in this case, we rejected this identical argument in Highland Park I.[6] In that case, Highland Park appealed from the Commissioner's March 19, 2015 final decision approving Hatikvah's second application to amend its charter to expand its grades. Highland Park I, (slip op. at 2).

In Highland Park I, the Appellate Division initially noted that Highland Park had not raised this issue in March 2014 when Hatikvah sought to renew its charter, or in November 2014 when Hatikvah sought to expand its enrollment. Id. at 14. Highland Park had never challenged the regulations requiring resident and non-resident school districts to fund their students' attendance at a charter

---

[6] Although the case is unpublished, it involved most of the same parties and the identical issue raised here, and thus even if not binding under the doctrine of collateral estoppel, the legal analysis is persuasive and may constitute secondary authority. R. 1:36-3.

school, and had "paid tuition for its students to attend the school for at least six years." Id. at 15. Nonetheless, because it involved "an issue of law," the court decided to exercise its discretion and address the argument even though it was raised for the first time on appeal. Ibid.

Turning to the merits, this court found that the plain language of N.J.S.A. 18A:36A-12(b) "expressly provides that the 'school district of residence' must pay the charter school for 'each student' enrolled in the school." Id. at 16. Thus, the court held that "as used in N.J.S.A. 18A:36A-12(b), the term 'school district of residence' refers to the district where the student resides, not the district where the charter school is located." Ibid. The court found that the CSPA

> expressly envisions that students may enroll in a charter school, even though they reside in a district other than the district where the charter school is located. See N.J.S.A. 18A:36A-8(a) (requiring charter schools to give preference for enrollment to students who reside "in the school district in which the charter school is located"). There is nothing in the Act that would allow these students to attend a charter school without a financial contribution from the school districts in which they reside. Thus, under N.J.S.A. 18A:36A-12(b), obligation of a school district to attend a charter school is not limited to the charter school's "district of residence."

> [Id. at 16-17.]

Further, we found that the regulations adopted pursuant to the CSPA were

"consistent with this interpretation of N.J.S.A. 18A:36A-12(b). Indeed, the regulations expressly provide that both a charter school's 'district of residence' and the 'non-resident school districts' must pay for their students to attend a charter school. N.J.A.C. 6A:23A-15.3(g)(2), (3)." Id. at 17. See also N.J.A.C. 6A:23A-15.2 (resident and non-resident school districts shall use projected charter school aid).

The court in Highland Park I also found support for this interpretation in the legislative history, explaining that in its fiscal estimate for S. 1796 (1995), which, combined with A. 592 (1995), became the CSPA, the Office of Legislative Services, included the following statement:

> In regard to the funding of charter schools, the bill provides that the school district of residence would pay directly to the charter school for each student enrolled who resides in the district an amount equal to the local levy budget per pupil in the district for the specific grade level. . . . The cost for out of district pupils would be paid by the district of residence of the pupil. . . .
>
> [Id. at 17-18 (quoting Legislative Fiscal Estimate to S. 1796 1 (Sept. 14, 1995) (emphasis added)).]

That statement "makes clear that all school districts of residence must pay for students to attend a charter school, and the financial obligation is not limited to the charter school's 'district of residence.'" Id. at 18.

In so ruling, we found unpersuasive Highland Park's citation to other

provisions of the Charter School Act that pertain to a charter school's "district

of residence." Id. at 18. For example, the court found that

> Highland Park cites N.J.S.A. 18A:36A-4(c), which requires a proposed charter school to provide a copy of its application to the "local board of education." However, the statute does not support Highland Park's argument. N.J.S.A. 18A:36A-4(c) also requires the Commissioner to provide notice to "members of the State Legislature, school superintendents, and mayors and governing bodies of all legislative districts, school districts, or municipalities in which there are students who will be eligible for enrollment in the charter school."
>
> Highland Park also cites N.J.S.A. 18A:36A-14(b), a statute that limits a charter school's salaries to the salaries of the highest step in the district where the school is located; and N.J.S.A. 18A:36A-16(b), which requires a charter school to serve a copy of its annual report on the local board of education in the district where the school is located. However, these statutes have no direct bearing on whether a student's "school district of residence" must pay for students from that district to attend at a charter school.
>
> [Id. at 18-19.]

Thus, we concluded that

> under N.J.S.A. 18A:36A-12(b), the term "school district of residence" means the school district where the student resides, and each "school district of residence" must pay the charter school for its student to attend the school, in the amounts required by the Act and the regulations. We therefore reject Highland Park's contention that only the charter school's "district

33

of residence" is obligated to pay for its students to attend the school.

[Id. at 19.]

Similarly, as addressed in Piscataway, the Commissioner issued a final decision in which she interpreted the CSPA and the regulatory provisions, N.J.A.C. 6A:23A-15.1 to -15.4, to require school districts to "provide funding for its students enrolled in charter schools located in other school districts." Bd. of Educ. of Twp. of Piscataway v. NJ Dep't of Educ., EDU 10995-16, final decision, (July 27, 2017) (the Piscataway Board of Education was obligated to pay for its resident students to attend a number of out-of-district charter schools).

Appellants argue that under that interpretation, non-resident school districts will be deprived of due process because non-resident districts are not entitled to receive formal notice of a charter school's application to amend its charter, or input into the amendment process. See N.J.A.C. 6A:11-2.6(a)(b). They argue that "the net effect of these regulations as applied by the Department is to render every New Jersey district the 'district of residence' of every charter school in the state."

However, because preference for enrollment in a charter school is given to students who reside in the school district in which the charter school is

34

located, N.J.S.A. 18A:36A-8(a), it is likely that the majority of students will reside in that district, and thus it makes sense that the district of residence should receive formal notice and an opportunity for input. Moreover, it was undisputed that appellants in this case, and in the back-to-back companion appeals, were aware of the amendment and had an opportunity to submit comments on the amendment request. In fact, the Commissioner received, and considered, comments from several school districts, individuals, an educational service commission, and even several legislators. Thus, the notice provisions simply do not relieve non-resident districts from bearing financial responsibility for its students' attendance at charter schools.

As noted in our decisions today in Highland Park II and Piscataway, we are persuaded by the reasoning expressed in Highland Park I, and by the Commissioner in her final decision in Piscataway. The plain language of the statute requires each student's district of residence to pay for the student to attend a charter school. N.J.S.A. 18A:36A-12(b). That interpretation is entirely consistent with the CSPA and the policy expressed by the Legislature. Charter schools are open to all students, both resident and non-resident students, and there is no indication in the CSPA that the Legislature intended to exclude non-resident districts from funding their students' attendance at a charter school. It

is also consistent with the legislative history and the implementing regulations, which require a non-resident district to fund its students' attendance at a charter school. N.J.A.C. 6A:23A-15.2 and -15.3. Thus, Piscataway is obligated to provide funding for its students enrolled in CJCP.

## VI.

In sum, we affirm the Commissioner's decision approving CJCP's application to amend its charter, and compelling Piscataway to fund its students' attendance at that school. The decision was not arbitrary, capricious, or unreasonable, promoted the legislative policy of the CSPA, and was fully supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION